# HEATH *v.* ALABAMA

No. 84–5555.   Argued October 9, 1985—Decided December 3, 1985

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, POWELL, REHNQUIST, and STEVENS, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 94. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 95.

*Ronald J. Allen* argued the cause and filed briefs for petitioner.

*William D. Little*, Assistant Attorney General of Alabama, argued the cause for respondent. With him on the brief was *Charles A. Graddick*, Attorney General.

JUSTICE O'CONNOR delivered the opinion of the Court.

The question before the Court is whether the Double Jeopardy Clause of the Fifth Amendment bars Alabama from trying petitioner for the capital offense of murder during a kidnaping after Georgia has convicted him of murder based on the same homicide. In particular, this case presents the issue of the applicability of the dual sovereignty doctrine to successive prosecutions by two States.

I

In August 1981, petitioner, Larry Gene Heath, hired Charles Owens and Gregory Lumpkin to kill his wife, Rebecca Heath, who was then nine months pregnant, for a sum of $2,000. On the morning of August 31, 1981, petitioner left the Heath residence in Russell County, Alabama, to meet with Owens and Lumpkin in Georgia, just over the Alabama

border from the Heath home. Petitioner led them back to the Heath residence, gave them the keys to the Heaths' car and house, and left the premises in his girlfriend's truck. Owens and Lumpkin then kidnaped Rebecca Heath from her home. The Heath car, with Rebecca Heath's body inside, was later found on the side of a road in Troup County, Georgia. The cause of death was a gunshot wound in the head. The estimated time of death and the distance from the Heath residence to the spot where Rebecca Heath's body was found are consistent with the theory that the murder took place in Georgia, and respondent does not contend otherwise.

Georgia and Alabama authorities pursued dual investigations in which they cooperated to some extent. On September 4, 1981, petitioner was arrested by Georgia authorities. Petitioner waived his *Miranda* rights and gave a full confession admitting that he had arranged his wife's kidnaping and murder. In November 1981, the grand jury of Troup County, Georgia, indicted petitioner for the offense of "malice" murder under Ga. Code Ann. § 16–5–1 (1984).[1] Georgia then served petitioner with notice of its intention to seek the death penalty, citing as the aggravating circumstance the fact that the murder was "caused and directed" by petitioner. Record 742. See Ga. Code Ann. § 17–10–30(b)(6) (1982). On February 10, 1982, petitioner pleaded guilty to the Georgia murder charge in exchange for a sentence of life imprisonment, which he understood could involve his serving as few as seven years in prison. See Record 495.

On May 5, 1982, the grand jury of Russell County, Alabama, returned an indictment against petitioner for the capi-

---

[1] The indictment read as follows:

"[The grand jurors] in the name and on behalf of the citizens of Georgia, charge and accuse LARRY GENE HEATH [et al.] with the offense of MURDER (26–1101); for that the said LARRY GENE HEATH [et al.] on the date of August 31, 1981, in the county aforesaid, did then and there unlawfully and with malice aforethought cause the death of Rebecca McGuire Heath, a human being, by shooting her with a gun, a deadly weapon." Record 740.

tal offense of murder during a kidnaping.[2] See Ala. Code § 13A–5–40(a)(1) (1982). Before trial on this indictment, petitioner entered pleas of *autrefois convict* and former jeopardy under the Alabama and United States Constitutions, arguing that his conviction and sentence in Georgia barred his prosecution in Alabama for the same conduct. Petitioner also entered a plea contesting the jurisdiction of the Alabama court on the ground that the crime had occurred in Georgia.

After a hearing, the trial court rejected petitioner's double jeopardy claims. It assumed, *arguendo*, that the two prosecutions could not have been brought in succession by one State but held that double jeopardy did not bar successive prosecutions by two different States for the same act. See Record 776. The court postponed a ruling on petitioner's plea to jurisdiction until the close of the State's case in chief. See *id.*, at 778.

At the close of the State's case, petitioner argued that Alabama did not have jurisdiction under state law because there had been no evidence of kidnaping and all the evidence showed that Rebecca Heath was killed in Georgia. The State responded that a kidnaping had been proved, and that under Ala. Code § 15–2–3 (1982), if a crime commences in Alabama it may be punished in Alabama regardless of where the crime is consummated. The court rejected both petitioner's jurisdictional plea and his renewed double jeopardy claims. See Record 590.

On January 12, 1983, the Alabama jury convicted petitioner of murder during a kidnaping in the first degree. After a sentencing hearing, the jury recommended the death

---

[2] The indictment stated:

"Larry Gene Heath did intentionally cause the death of Rebecca Heath, by shooting her with a gun, and Larry Gene Heath caused said death during Larry Gene Heath's abduction of, or attempt to abduct, Rebecca Heath with intent to inflict physical injury upon her, in violation of § 13A–5–40(a)(1) of the Code of Alabama 1975, as amended, against the peace and dignity of the State of Alabama." *Id.*, at 728.

penalty. Pursuant to Alabama law, a second sentencing hearing was held before the trial judge. The judge accepted the jury's recommendation, finding that the sole aggravating factor, that the capital offense was "committed while the defendant was engaged in the commission of a kidnapping," outweighed the sole mitigating factor, that the "defendant was convicted of the murder of Rebecca Heath in the Superior Court of Troup County, Georgia, . . . and received a sentence of life imprisonment in that court." *Id.*, at 718–720. See Ala. Code §§ 13A–5–49(4), 13A–5–50 (1982).

On appeal, the Alabama Court of Criminal Appeals rejected petitioner's pleas of *autrefois convict* and former jeopardy under the Alabama and United States Constitutions and affirmed his conviction. 455 So. 2d 898 (1983). Petitioner then filed a petition for writ of certiorari with the Alabama Supreme Court, stating the sole issue to be "whether or not the prosecution in the State of Alabama constituted double jeopardy in violation of the 5th Amendment of the United States Constitution." App. 92. The court granted his petition, and unanimously affirmed his conviction. *Ex parte Heath*, 455 So. 2d 905 (1984).

The Alabama Supreme Court noted that "[p]rosecutions under the laws of separate sovereigns do not improperly subject an accused twice to prosecutions for the same offense," citing this Court's cases applying the dual sovereignty doctrine. *Id.*, at 906. The court acknowledged that this Court has not considered the applicability of the dual sovereignty doctrine to successive prosecutions by different States. It reasoned, however, that "[i]f, for double jeopardy purposes, Alabama is considered to be a sovereign entity vis-à-vis the federal government then surely it is a sovereign entity vis-à-vis the State of Georgia." *Ibid.*

Petitioner sought a writ of certiorari from this Court, raising double jeopardy claims and claims based on Alabama's exercise of jurisdiction. No due process objections were asserted. We granted certiorari limited to the question

whether petitioner's Alabama conviction was barred by this Court's decision in *Brown* v. *Ohio*, 432 U. S. 161 (1977), and requested the parties to address the question of the applicability of the dual sovereignty doctrine to successive prosecutions by two States. 470 U. S. 1026 (1985). For the reasons explained below, we affirm the judgment of the Alabama Supreme Court.

Despite the fact that this Court did not grant certiorari on the constitutional objection to Alabama's exercise of jurisdiction, petitioner has continued to argue in this Court his jurisdictional claim. See Tr. of Oral Arg. 11–22, 29–31; Brief for Petitioner 15. We decline to decide the issue because petitioner did not claim lack of jurisdiction in his petition to the Alabama Supreme Court and he raised the claim for the first time in his petition to this Court. Pet. for Cert. 4. Even if we were not jurisdictionally barred from considering claims not pressed or passed upon in the state court, as has sometimes been stated, see, *e. g.*, *State Farm Mutual Automobile Ins. Co.* v. *Duel*, 324 U. S. 154, 160 (1945); *Crowell* v. *Randell*, 10 Pet. 368, 392 (1836), the longstanding rule that this Court will not consider such claims creates, at the least, a weighty presumption against review. See, *e. g.*, *Illinois* v. *Gates*, 462 U. S. 213, 218–222 (1983).

## II

Successive prosecutions are barred by the Fifth Amendment only if the two offenses for which the defendant is prosecuted are the "same" for double jeopardy purposes. Respondent does not contravene petitioner's contention that the offenses of "murder during a kidnaping" and "malice murder," as construed by the courts of Alabama and Georgia respectively, may be considered greater and lesser offenses and, thus, the "same" offense under *Brown* v. *Ohio, supra,* absent operation of the dual sovereignty principle. See *id.,* at 169; *Illinois* v. *Vitale,* 447 U. S. 410 (1980). We therefore assume, *arguendo,* that, had these offenses arisen under

the laws of one State and had petitioner been separately prosecuted for both offenses in that State, the second conviction would have been barred by the Double Jeopardy Clause.

The sole remaining question upon which we granted certiorari is whether the dual sovereignty doctrine permits successive prosecutions under the laws of different States which otherwise would be held to "subject [the defendant] for the same offence to be twice put in jeopardy." U. S. Const., Amdt. 5. Although we have not previously so held, we believe the answer to this query is inescapable. The dual sovereignty doctrine, as originally articulated and consistently applied by this Court, compels the conclusion that successive prosecutions by two States for the same conduct are not barred by the Double Jeopardy Clause.

The dual sovereignty doctrine is founded on the common-law conception of crime as an offense against the sovereignty of the government. When a defendant in a single act violates the "peace and dignity" of two sovereigns by breaking the laws of each, he has committed two distinct "offences." *United States* v. *Lanza,* 260 U. S. 377, 382 (1922). As the Court explained in *Moore* v. *Illinois,* 14 How. 13, 19 (1852), "[a]n offence, in its legal signification, means the transgression of a law." Consequently, when the same act transgresses the laws of two sovereigns, "it cannot be truly averred that the offender has been twice punished for the same offence; but only that by one act he has committed two offences, for each of which he is justly punishable." *Id.,* at 20.

In applying the dual sovereignty doctrine, then, the crucial determination is whether the two entities that seek successively to prosecute a defendant for the same course of conduct can be termed separate sovereigns. This determination turns on whether the two entities draw their authority to punish the offender from distinct sources of power. See, *e. g.,* *United States* v. *Wheeler,* 435 U. S. 313, 320 (1978); *Waller* v. *Florida,* 397 U. S. 387, 393 (1970); *Puerto Rico* v.

*Shell Co.*, 302 U. S. 253, 264–265 (1937); *Lanza, supra*, at 382; *Grafton* v. *United States*, 206 U. S. 333, 354–355 (1907). Thus, the Court has uniformly held that the States are separate sovereigns with respect to the Federal Government because each State's power to prosecute is derived from its own "inherent sovereignty," not from the Federal Government. *Wheeler, supra*, at 320, n. 14. See *Abbate* v. *United States*, 359 U. S. 187, 193–194 (1959) (collecting cases); *Lanza, supra*. As stated in *Lanza, supra*, at 382:

> "Each government in determining what shall be an offense against its peace and dignity is exercising its own sovereignty, not that of the other.
>
> "It follows that an act denounced as a crime by both national and state sovereignties is an offense against the peace and dignity of both and may be punished by each."

See also *Bartkus* v. *Illinois*, 359 U. S. 121 (1959); *Westfall* v. *United States*, 274 U. S. 256, 258 (1927) (Holmes, J.) (the proposition that the State and Federal Governments may punish the same conduct "is too plain to need more than statement").

The States are no less sovereign with respect to each other than they are with respect to the Federal Government. Their powers to undertake criminal prosecutions derive from separate and independent sources of power and authority originally belonging to them before admission to the Union and preserved to them by the Tenth Amendment. See *Lanza, supra*, at 382. The States are equal to each other "in power, dignity and authority, each competent to exert that residuum of sovereignty not delegated to the United States by the Constitution itself." *Coyle* v. *Oklahoma*, 221 U. S. 559, 567 (1911). See *Skiriotes* v. *Florida*, 313 U. S. 69, 77 (1941). Thus, "[e]ach has the power, inherent in any sovereign, independently to determine what shall be an offense against its authority and to punish such offenses, and in doing so each 'is exercising its own sovereignty, not that of the

other.'" *Wheeler, supra,* at 320 (quoting *Lanza, supra,* at 382).

The cases in which the Court has applied the dual sovereignty principle outside the realm of successive federal and state prosecutions illustrate the soundness of this analysis. *United States* v. *Wheeler, supra,* is particularly instructive because there the Court expressly refused to find that only the State and Federal Governments could be considered distinct sovereigns with respect to each other for double jeopardy purposes, stating that "so restrictive a view of [the dual sovereignty] concept . . . would require disregard of the very words of the Double Jeopardy Clause." *Id.,* at 330. Instead, the *Wheeler* Court reiterated the principle that the sovereignty of two prosecuting entities for these purposes is determined by "the ultimate source of the power under which the respective prosecutions were undertaken." *Id.,* at 320. On the basis of this reasoning, the Court held that the Navajo Tribe, whose power to prosecute its members for tribal offenses is derived from the Tribe's "primeval sovereignty" rather than a delegation of federal authority, is an independent sovereign from the Federal Government for purposes of the dual sovereignty doctrine. *Id.,* at 328.

In those instances where the Court has found the dual sovereignty doctrine inapplicable, it has done so because the two prosecuting entities did not derive their powers to prosecute from independent sources of authority. Thus, the Court has held that successive prosecutions by federal and territorial courts are barred because such courts are "creations emanating from the same sovereignty." *Puerto Rico,* 302 U. S., at 264. See *id.,* at 264–266. See also *Grafton, supra* (the Philippine Islands). Similarly, municipalities that derive their power to try a defendant from the same organic law that empowers the State to prosecute are not separate sovereigns with respect to the State. See, *e. g., Waller, supra.* These cases confirm that it is the presence of independent sovereign authority to prosecute, not the relation between States and the Federal Gov-

ernment in our federalist system, that constitutes the basis for the dual sovereignty doctrine.

Petitioner argues that *Nielsen* v. *Oregon,* 212 U. S. 315 (1909), indicates, albeit in dicta, that where States have concurrent jurisdiction over a criminal offense, the first State to prosecute thereby bars prosecution by any other State. We find that *Nielsen* is limited to its unusual facts and has continuing relevance, if at all, only to questions of jurisdiction between two entities deriving their concurrent jurisdiction from a single source of authority. In *Nielsen,* the Court set aside a conviction obtained by the State of Oregon against a resident of the State of Washington for his operation of a purse net for fish in the Columbia River pursuant to a valid license to do so from the State of Washington. The Court noted:

> "By the legislation of Congress the Columbia River is made the common boundary between Oregon and Washington, and to each of those States is given concurrent jurisdiction on the waters of that river." *Id.,* at 319. "[T]he grant of concurrent jurisdiction may bring up from time to time . . . some curious and difficult questions, so we properly confine ourselves to the precise question presented. . . . It is enough to decide, as we do, that for an act done within the territorial limits of the State of Washington under authority and license from that State one cannot be prosecuted and punished by the State of Oregon." *Id.,* at 320–321.

It is obvious that the *Nielsen* Court did not attempt to decide or even to consider the double jeopardy effect of successive state prosecutions for offenses proscribed by both States; the case, therefore, has no bearing on the issue of the applicability of the dual sovereignty doctrine presented in this case.

## III

Petitioner invites us to restrict the applicability of the dual sovereignty principle to cases in which two governmental

entities, having concurrent jurisdiction and pursuing quite different interests, can demonstrate that allowing only one entity to exercise jurisdiction over the defendant will interfere with the unvindicated interests of the second entity and that multiple prosecutions therefore are necessary for the satisfaction of the legitimate interests of both entities. This balancing of interests approach, however, cannot be reconciled with the dual sovereignty principle. This Court has plainly and repeatedly stated that two identical offenses are *not* the "same offence" within the meaning of the Double Jeopardy Clause if they are prosecuted by different sovereigns. See, *e. g.*, *United States* v. *Lanza*, 260 U. S. 377 (1922) (same conduct, indistinguishable statutes, same "interests"). If the States are separate sovereigns, as they must be under the definition of sovereignty which the Court consistently has employed, the circumstances of the case are irrelevant.

Petitioner, then, is asking the Court to discard its sovereignty analysis and to substitute in its stead his difficult and uncertain balancing of interests approach. The Court has refused a similar request on at least one previous occasion, see *Abbate* v. *United States*, 359 U. S. 187 (1959); *id.*, at 196 (BRENNAN, J., separate opinion), and rightfully so. The Court's express rationale for the dual sovereignty doctrine is not simply a fiction that can be disregarded in difficult cases. It finds weighty support in the historical understanding and political realities of the States' role in the federal system and in the words of the Double Jeopardy Clause itself, "nor shall any person be subject for the same *offence* to be twice put in jeopardy of life or limb." U. S. Const., Amdt. 5 (emphasis added). See *Wheeler*, 435 U. S., at 330.

It is axiomatic that "[i]n America, the powers of sovereignty are divided between the government of the Union, and those of the States. They are each sovereign, with respect to the objects committed to it, and neither sovereign with respect to the objects committed to the other."

*McCulloch* v. *Maryland,* 4 Wheat. 316, 410 (1819). It is as well established that the States, "as political communities, [are] distinct and sovereign, and consequently foreign to each other." *Bank of United States* v. *Daniel,* 12 Pet. 32, 54 (1838). See also *Skiriotes* v. *Florida,* 313 U. S., at 77; *Coyle* v. *Oklahoma,* 221 U. S., at 567. The Constitution leaves in the possession of each State "certain exclusive and very important portions of sovereign power." The Federalist No. 9, p. 55 (J. Cooke ed. 1961). Foremost among the prerogatives of sovereignty is the power to create and enforce a criminal code. See, *e. g., Alfred L. Snapp & Son, Inc.* v. *Puerto Rico ex rel. Barez,* 458 U. S. 592, 601 (1982); *McCulloch, supra,* at 418. To deny a State its power to enforce its criminal laws because another State has won the race to the courthouse "would be a shocking and untoward deprivation of the historic right and obligation of the States to maintain peace and order within their confines." *Bartkus,* 359 U. S., at 137.

Such a deprivation of a State's sovereign powers cannot be justified by the assertion that under "interest analysis" the State's legitimate penal interests will be satisfied through a prosecution conducted by another State. A State's interest in vindicating its sovereign authority through enforcement of its laws by definition can never be satisfied by another State's enforcement of *its* own laws. Just as the Federal Government has the right to decide that a state prosecution has not vindicated a violation of the "peace and dignity" of the Federal Government, a State must be entitled to decide that a prosecution by another State has not satisfied its legitimate sovereign interest. In recognition of this fact, the Court consistently has endorsed the principle that a single act constitutes an "offence" against each sovereign whose laws are violated by that act. The Court has always understood the words of the Double Jeopardy Clause to reflect this fundamental principle, and we see no reason why we should reconsider that understanding today.

The judgment of the Supreme Court of Alabama is affirmed.

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

I concur wholeheartedly in JUSTICE MARSHALL's dissent. I write separately only to clarify my views on the role that "different interests" should play in determining whether two prosecutions are "for the same offence" within the meaning of the Double Jeopardy Clause.

In *Abbate* v. *United States*, 359 U. S. 187 (1959), in addition to arguing that the dual sovereignty doctrine permitted successive state and federal prosecutions, the Federal Government also urged that the federal prosecution was not barred because the two prosecutions were not "for the same offense." The Government's theory was that, because the federal and state statutes involved had divergent *specific purposes*—the federal law to protect communications and the state law to protect private property—and thus promoted different "interests," the prosecutions were really for different offenses.

I rejected this argument in a separate opinion. *Id.*, at 196–201. My concern was that "this reasoning would apply equally if each of two successive *federal* prosecutions based on the same acts was brought under a different *federal* statute, and each statute was designed to protect a different federal interest." *Id.*, at 197 (emphasis in original). That result I found clearly barred by the Fifth Amendment.*

---

*I illustrated how radical and pernicious a revision in existing double jeopardy jurisprudence the Government's theory might work by referring to *In re Nielsen*, 131 U. S. 176 (1889). *Abbate* v. *United States*, 359 U. S., at 201. In *Nielsen*, the defendant, a Mormon with more than one wife, had been convicted of violating two separate congressional statutes that applied to the Territory of Utah in two successive prosecutions. In the first prosecution he was tried for and convicted of cohabiting with more

I adhere to the position I took in *Abbate*, that the different purposes or interests served by specific statutes cannot justify an exception to our established double jeopardy law. However, I read JUSTICE MARSHALL's dissent to use "interest" analysis in another context. He employs it to demonstrate the qualitative difference in the general nature of federal and state interests and the qualitative similarity in the nature of States' interest. JUSTICE MARSHALL's use of this interest analysis furthers, rather than undermines, the purposes of the Double Jeopardy Clause. Based on this understanding, I join JUSTICE MARSHALL's dissent.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

Seizing upon the suggestion in past cases that every "independent" sovereign government may prosecute violations of its laws even when the defendant has already been tried for the same crime in another jurisdiction, the Court today gives short shrift to the policies underlying those precedents. The "dual sovereignty" doctrine, heretofore used to permit federal and state prosecutions for the same offense, was born of the need to accommodate complementary state and federal concerns within our system of concurrent territorial jurisdictions. It cannot justify successive prosecutions by different States. Moreover, even were the dual sovereignty doctrine to support successive state prosecutions as a general matter, it simply could not legitimate the collusion between Georgia and Alabama in this case to ensure that petitioner is executed for his crime.

---

than one woman, in the second he was tried for and convicted of adultery. The Court correctly held that the second prosecution had unconstitutionally placed the defendant twice in jeopardy for the same offense. Under the rule the Government proposed in *Abbate*, however, the mere difference between the interests in prohibiting multiple sexual partners and in proscribing extramarital sexual relationships would have permitted successive prosecutions.

I

On August 31, 1981, the body of Rebecca Heath was discovered in an abandoned car in Troup County, Georgia. Because the deceased was a resident of Russell County, Alabama, members of the Russell County Sheriff's Department immediately joined Troup County authorities in investigating the causes and agents of her death. Tr. 359. This cooperative effort proved fruitful. On September 4, petitioner Larry Heath, the deceased's husband, was arrested and brought to the Georgia State Patrol barracks in Troup County, where he confessed to having hired other men to murder his wife. Shortly thereafter, petitioner was indicted by the grand jury of Troup County for malice murder. The prosecution's notice to petitioner that it was seeking the death penalty triggered the beginning of the Unified Appeals Procedure that Georgia requires in capital cases. But while these pretrial proceedings were still in progress, petitioner seized the prosecution's offer of a life sentence in exchange for a guilty plea. Upon entry of his plea in February 1982, petitioner was sentenced in Troup County Superior Court to life imprisonment. His stay in the custody of Georgia authorities proved short, however. Three months later, a Russell County, Alabama, grand jury indicted him for the capital offense of murdering Rebecca Heath during the course of a kidnaping in the first degree.

The murder of Rebecca Heath must have been quite noteworthy in Russell County, Alabama. By petitioner's count, of the 82 prospective jurors questioned before trial during *voir dire*, all but 7 stated that they were aware that petitioner had pleaded guilty to the same crime in Georgia. *Id.*, at 294. The *voir dire* responses of almost all of the remaining 75 veniremen can only be characterized as remarkable. When asked whether they could put aside their knowledge of the prior guilty plea in order to give petitioner a fair trial in Alabama, the vast majority answered in the affirmative. See, *e. g.*, *id.*, at 110, 112–113, 134, 254. These answers sat-

isfied the trial judge, who denied petitioner's challenges for cause except as to those jurors who explicitly admitted that the Georgia proceedings would probably affect their assessment of petitioner's guilt.

With such a well-informed jury, the outcome of the trial was surely a foregone conclusion. Defense counsel could do little but attempt to elicit information from prosecution witnesses tending to show that the crime was committed exclusively in Georgia. The court having rejected petitioner's constitutional and jurisdictional claims, the defense was left to spend most of its summation arguing that Rebecca Heath may not actually have been kidnaped from Alabama before she was murdered and that petitioner was already being punished for ordering that murder. Petitioner was convicted and, after sentencing hearings, was condemned to die. The conviction and sentence were upheld by the Alabama Court of Criminal Appeals, 455 So. 2d 898 (1983), and the Alabama Supreme Court. *Ex parte Heath*, 455 So. 2d 905 (1984).

## II

Had the Georgia authorities suddenly become dissatisfied with the life sentence petitioner received in their courts and reindicted petitioner in order to seek the death penalty once again, that indictment would without question be barred by the Double Jeopardy Clause of the Fifth Amendment, as applied to the States by the Fourteenth Amendment, *Benton* v. *Maryland*, 395 U. S. 784 (1969). Whether the second indictment repeated the charge of malice murder or instead charged murder in the course of a kidnaping, it would surely, under any reasonable constitutional standard, offend the bar to successive prosecutions for the same offense. See *Brown* v. *Ohio*, 432 U. S. 161, 166 (1977); *id.*, at 170 (BRENNAN, J., concurring).

The only difference between this case and such a hypothetical volte-face by Georgia is that here Alabama, not Georgia, was offended by the notion that petitioner might

not forfeit his life in punishment for his crime. The only reason the Court gives for permitting Alabama to go forward is that Georgia and Alabama are separate sovereigns.

## A

The dual sovereignty theory posits that where the same act offends the laws of two sovereigns, "it cannot be truly averred that the offender has been twice punished for the same offence; but only that by one act he has committed two offences, for each of which he is justly punishable." *Moore* v. *Illinois*, 14 How. 13, 20 (1852). Therefore, "prosecutions under the laws of separate sovereigns do not, in the language of the Fifth Amendment, 'subject [the defendant] for the same offence to be twice put in jeopardy.'" *United States* v. *Wheeler*, 435 U. S. 313, 317 (1978). Mindful of the admonitions of Justice Black, we should recognize this exegesis of the Clause as, at best, a useful fiction and, at worst, a dangerous one. See *Bartkus* v. *Illinois*, 359 U. S. 121, 158 (1959) (Black, J., dissenting). No evidence has ever been adduced to indicate that the Framers intended the word "offence" to have so restrictive a meaning.[1]

This strained reading of the Double Jeopardy Clause has survived and indeed flourished in this Court's cases not because of any inherent plausibility, but because it provides reassuring interpretivist support for a rule that accommodates the unique nature of our federal system. Before this rule is extended to cover a new class of cases, the reasons for its creation should therefore be made clear.

---

[1] It is curious to note how reluctant the Court has always been to ascertain the intent of the Framers in this area. The furthest the Court has ever progressed on such an inquiry was to note: "It has not been deemed relevant to discussion of our problem to consider dubious English precedents concerning the effect of foreign criminal judgments on the ability of English courts to try charges arising out of the same conduct . . . ." *Bartkus* v. *Illinois*, 359 U. S., at 128, n. 9. But see *id.*, at 156 (Black, J., dissenting); M. Friedland, Double Jeopardy 360–364 (1969).

Under the constitutional scheme, the Federal Government has been given the exclusive power to vindicate certain of our Nation's sovereign interests, leaving the States to exercise complementary authority over matters of more local concern. The respective spheres of the Federal Government and the States may overlap at times, and even where they do not, different interests may be implicated by a single act. See, *e. g.*, *Abbate* v. *United States*, 359 U. S. 187 (1959) (conspiracy to dynamite telephone company facilities entails both destruction of property and disruption of federal communications network). Yet were a prosecution by a State, however zealously pursued, allowed to preclude further prosecution by the Federal Government for the same crime, an entire range of national interests could be frustrated. The importance of those federal interests has thus quite properly been permitted to trump a defendant's interest in avoiding successive prosecutions or multiple punishments for the same crime. See *Screws* v. *United States*, 325 U. S. 91, 108–110, and n. 10 (1945) (plurality opinion). Conversely, because "the States under our federal system have the principal responsibility for defining and prosecuting crimes," *Abbate* v. *United States, supra,* at 195, it would be inappropriate—in the absence of a specific congressional intent to pre-empt state action pursuant to the Supremacy Clause—to allow a federal prosecution to preclude state authorities from vindicating "the historic right and obligation of the States to maintain peace and order within their confines," *Bartkus* v. *Illinois, supra,* at 137.

The complementary nature of the sovereignty exercised by the Federal Government and the States places upon a defendant burdens commensurate with concomitant privileges. Past cases have recognized that the special ordeal suffered by a defendant prosecuted by both federal and state authorities is the price of living in a federal system, the cost of dual citizenship. Every citizen, the Court has noted, "owes allegiance to the two departments, so to speak, and within their

respective spheres must pay the penalties which each exacts for disobedience to its laws. In return, he can demand protection from each within its own jurisdiction." *United States* v. *Cruikshank*, 92 U. S. 542, 551 (1876). See *Moore* v. *Illinois, supra,* at 20 ("Every citizen . . . may be said to owe allegiance to two sovereigns, and may be liable to punishment for an infraction of the laws of either").

B

Because all but one of the cases upholding the dual sovereignty doctrine have involved the unique relationship between the Federal Government and the States,[2] the question whether a similar rule should exempt successive prosecutions by two different States from the command of the Double Jeopardy Clause is one for which this Court's precedents provide all too little illumination. Only once before has the Court explicitly considered competing state prosecutorial interests. In that case, it observed that where an act is prohibited by the laws of two States with concurrent jurisdiction over the locus of the offense

"the one first acquiring jurisdiction of the person may prosecute the offense, and its judgment is a finality in both States, so that one convicted or acquitted in the courts of the one State cannot be prosecuted for the same offense in the courts of the other." *Nielsen* v. *Oregon,* 212 U. S. 315, 320 (1909).

Where two States seek to prosecute the same defendant for the same crime in two separate proceedings, the justifica-

[2] *United States* v. *Wheeler,* 435 U. S. 313 (1978), where the Court upheld successive prosecutions by Federal Government and Navajo tribal authorities, merely recognizes an analogous relationship between two governments with complementary concerns. While the Court noted that "Congress has plenary authority to legislate for the Indian tribes in all matters, including their form of government," *id.,* at 319, Congress has in fact wisely refrained from interfering in this sensitive area. The relationship between federal and tribal authorities is thus in this respect analogous to that between the Federal Government and the States.

tions found in the federal-state context for an exemption from double jeopardy constraints simply do not hold. Although the two States may have opted for different policies within their assigned territorial jurisdictions, the sovereign concerns with whose vindication each State has been charged are identical. Thus, in contrast to the federal-state context, barring the second prosecution would still permit one government to act upon the broad range of sovereign concerns that have been reserved to the States by the Constitution. The compelling need in the federal-state context to subordinate double jeopardy concerns is thus considerably diminished in cases involving successive prosecutions by different States. Moreover, from the defendant's perspective, the burden of successive prosecutions cannot be justified as the *quid pro quo* of dual citizenship.

To be sure, a refusal to extend the dual sovereignty rule to state-state prosecutions would preclude the State that has lost the "race to the courthouse" from vindicating legitimate policies distinct from those underlying its sister State's prosecution. But as yet, I am not persuaded that a State's desire to further a particular policy should be permitted to deprive a defendant of his constitutionally protected right not to be brought to bar more than once to answer essentially the same charges.

### III

Having expressed my doubts as to the Court's ill-considered resolution of the dual sovereignty question in this case, I must confess that my quarrel with the Court's disposition of this case is based less upon how this question was resolved than upon the fact that it was considered at all. Although, in granting Heath's petition for certiorari, this Court ordered the parties to focus upon the dual sovereignty issue, I believe the Court errs in refusing to consider the fundamental unfairness of the process by which petitioner stands condemned to die.

Even where the power of two sovereigns to pursue separate prosecutions for the same crime has been undisputed, this Court has barred both governments from combining to do together what each could not constitutionally do on its own. See *Murphy* v. *Waterfront Comm'n*, 378 U. S. 52 (1964); *Elkins* v. *United States*, 364 U. S. 206 (1960).[3] And just as the Constitution bars one sovereign from facilitating another's prosecution by delivering testimony coerced under promise of immunity or evidence illegally seized, I believe that it prohibits two sovereigns from combining forces to ensure that a defendant receives only the trappings of criminal process as he is sped along to execution.

While no one can doubt the propriety of two States cooperating to bring a criminal to justice, the cooperation between Georgia and Alabama in this case went far beyond their initial joint investigation. Georgia's efforts to secure petitioner's execution did not end with its acceptance of his guilty plea. Its law enforcement officials went on to play leading roles as prosecution witnesses in the Alabama trial. Indeed, had the Alabama trial judge not restricted the State to one assisting officer at the prosecution's table during trial, a Georgia officer would have shared the honors with an Alabama officer. Tr. 298. Although the record does not reveal

---

[3] To be sure, *Murphy*, which bars a State from compelling a witness to give testimony that might be used against him in a federal prosecution, and *Elkins*, which bars the introduction in a federal prosecution of evidence illegally seized by state officers, do not necessarily undermine the basis of the rule allowing successive state and federal prosecutions. It is one thing to bar a sovereign from using certain evidence and quite another to bar it from prosecuting altogether. But these cases can be read to suggest that despite the independent sovereign status of the Federal and State Governments, courts should not be blind to the impact of combined federal-state law enforcement on an accused's constitutional rights. See Note, Double Prosecution by State and Federal Governments: Another Exercise in Federalism, 80 Harv. L. Rev. 1538, 1547 (1967). Justice Harlan's belief that *Murphy* "abolished the 'two sovereignties' rule," *Stevens* v. *Marks*, 383 U. S. 234, 250 (1966) (Harlan, J., concurring in part, dissenting in part), was thus well founded.

the precise nature of the assurances made by Georgia authorities that induced petitioner to plead guilty in the first proceeding against him, I cannot believe he would have done so had he been aware that the officials whose forbearance he bought in Georgia with his plea would merely continue their efforts to secure his death in another jurisdiction. Cf. *Santobello* v. *New York*, 404 U. S. 257, 262 (1971).

Even before the Fourteenth Amendment was held to incorporate the protections of the Double Jeopardy Clause, four Members of this Court registered their outrage at "an instance of the prosecution being allowed to harass the accused with repeated trials and convictions on the same evidence, until it achieve[d] its desired result of a capital verdict." *Ciucci* v. *Illinois*, 356 U. S. 571, 573 (1958). Such "relentless prosecutions," they asserted, constituted "an unseemly and oppressive use of a criminal trial that violates the concept of due process contained in the Fourteenth Amendment, whatever its ultimate scope is taken to be." *Id.*, at 575. The only differences between the facts in *Ciucci* and those in this case are that here the relentless effort was a cooperative one between two States and that petitioner sought to avoid trial by pleading guilty. Whether viewed as a violation of the Double Jeopardy Clause or simply as an affront to the due process guarantee of fundamental fairness, Alabama's prosecution of petitioner cannot survive constitutional scrutiny. I therefore must dissent.