215 N.J. Super. 504 (1987)
522 A.2d 455
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JAMES KING, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted February 11, 1987.
Decided March 5, 1987.
*507 Before Judges KING, DEIGHAN and HAVEY.
Alfred A. Slocum, Public Defender of New Jersey, attorney for appellant (Alan I. Smith, Designated Counsel, of counsel and on the brief).
*508 W. Cary Edwards, Attorney General of New Jersey, attorney for respondent (Catherine A. Foddai, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by KING, P.J.A.D.
Defendant appeals his convictions under a multiple-count indictment charging various assaultive crimes and his aggregate 15 to 30-year sentence. We conclude that, except for a modification of the sentence as to Count 11, the convictions and sentence must be affirmed.
This is the procedural background. Defendant was charged with the following: possession of a handgun without the requisite permit, contrary to N.J.S.A. 2C:39-5b (Count One); possession of a firearm for an unlawful purpose, contrary to N.J.S.A. 2C:39-4a (Count Two); aggravated assault, contrary to N.J.S.A. 2C:12-1b(2) and N.J.S.A. 2C:12-1b(4) (Counts Three, Four, Nine and Ten); attempted murder, contrary to N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3 (Counts Five and Eleven); receiving stolen property, contrary to N.J.S.A. 2C:20-7 (Counts Six and Seven) and theft of movable property, contrary to N.J.S.A. 2C:20-3 (Count Eight). Defendant was convicted after a jury trial on all counts but Count Eight.
Defendant was sentenced as follows: on Counts One and Seven to two concurrent five-year terms of imprisonment; on Count Five to an extended term of 20 years imprisonment with a ten-year parole disqualifier; and on Count Eleven, to ten years imprisonment with a five-year parole disqualifier consecutive to Count Five. Counts Two, Three and Four were merged with Count Five, and Counts Nine and Ten were merged with Count Eleven. A $100 penalty to the VCCB was also imposed.
This is the factual background. On February 15, 1983 at about 9:30 a.m. Paula Palermo, branch manager of the Queen City Savings and Loan on 655 Raritan Road in Cranford, New Jersey, and Annette Marie Hergert, assistant manager, were at *509 work when several men wearing ski masks, jumpsuits, jean shirts, and sneakers came into the bank. One of the robbers was six-feet tall and wore a blue denim jumpsuit, gray sneakers, and orange gloves. He held a silver revolver with a wooden handle in his right hand and, as he approached Hergert's desk, he shouted, "Get on the floor." Everyone obeyed this command. However, Palermo was still able to see what was going on in the back of the bank because she was behind the teller's counter when the robbers entered. She saw one of the robbers jump over the third teller's window, move to the drive-in area of the bank, push the teller, Denise Rodriguez, to the floor, and remove money from a drawer. At the same time, another robber reached into the teller's drawer directly above where Palermo was lying and removed money which tripped a silent alarm. When he realized this, the robber urged his cohorts to hurry and they took packets of checks and travelers checks as well as a packet of money that had been treated with exploding red dye. The robbers fled in a 1975 Ford LTD which had been stolen the day before.
Palermo then locked the bank and contacted security. Responding officers included Detective Sgt. John Hicks and F.B.I. Agent Martin Houlihan. Hicks was informed that the LTD had been found in a nearby parking lot about a half-mile from the bank. He located the vehicle and found a red dye stain on the floorboard and a burn mark on the left rear of the car. Meanwhile a pillowcase with red-dyed cash was turned in to the Cranford Police by a man named Glen Comes who found it in the middle of Raritan Road.
Officer John Lowery of the Cranford Police Department heard a radio report concerning the robbery, learned that the suspects were headed for the Garden State Parkway, a limited access freeway, and proceeded to the northbound entrance ramp at Exit 137 to set up a roadblock. When he arrived at the ramp Detective Sgt. Milton Mason had already arrived and was halting all four lanes of traffic. Mason had received information concerning a light-colored Ford with four black males *510 inside which was supposedly being used as the getaway car. Traffic was then funnelled into the extreme left and right lanes; Mason checked cars on the left while Lowery checked those on the right.
State Trooper Kornelius Vander Ploeg was also on the Parkway at this time and heard a radio report concerning a yellow Ford which the suspects were driving towards the Parkway. Vander Ploeg was driving south but noticed the roadblock in the northbound lanes and joined Officer Lowery in checking cars on the right hand side of the roadblock.
About ten minutes after the procedure was initiated, a light-colored car approached Mason in the far left lane. Mason saw two black males seated in the front and, as the car got closer, he noticed at least one other male lying down on the floor in the back. The car raced through the roadblock as Mason yelled to Lowery and Vander Ploeg to "check that vehicle out." Lowery and Vander Ploeg quickly gave chase in their respective cars and Mason followed closely behind. Vander Ploeg took the lead in the chase, which was proceeding at 70 to 80 miles per hour, but had to take evasive action to avoid a collision with another motorist and gave the lead to Lowery who was able to come within 30 feet of the Ford. Lowery observed that the occupants of the car were four black males. The man in the left rear was in his 30's, with facial hair, wearing a black coat with blue overalls and bright orange gloves, and carrying a .38 caliber revolver. Later that day, Lowery identified this man as the defendant, James King.
At approximately Milepost 141, defendant completely turned around in the back of the car and faced Lowery. He reached out of the driver's side window and fired his revolver three times at Lowery. Shortly before reaching a toll plaza the Ford moved from the extreme left lane across three lanes of traffic and went through the far right toll lane at 70 miles per hour, followed closely by Lowery and Vander Ploeg.
*511 The Ford then left the Parkway at Exit 142 and got on I-78 headed towards Newark. All three passengers turned and fired their guns at Lowery during this part of the chase. Vander Ploeg corroborated this by testifying that he was only two car lengths behind Lowery at the time and that he saw the muzzle flash when the shots were fired at Lowery. At Exit 56 the Ford attempted to get off I-78 but crashed into a Volkswagen which was trying to exit at the same time. Lowery's patrol car also became involved in the accident and he was stunned for a few seconds but then managed to get out of his car and take a shotgun with him. By this point the four occupants of the Ford had jumped out of their vehicle and climbed over a snowbank separating the exit from the roadway. Defendant attempted to shoot at Lowery from a distance of about 25 feet but his gun did not fire. Lowery also attempted to shoot defendant but the safety catch was on his gun and by the time he could fire the weapon King was already 200 feet away. Vander Ploeg and Mason arrived within seconds after the suspects got away. All three policemen met at a fence which had jagged edges at its top and which the suspects had most likely scaled.
Rather than climb the fence, the two officers and the trooper went through a hole which they found in the fence and entered a residential section of Newark. All three searched the area for the suspects, Lowery and Vander Ploeg together and Mason by himself. As Mason passed by 186 Hawthorne Avenue, he saw a man sweeping outside. Mason asked the man, later identified as the defendant, whether he lived there and the man responded affirmatively. The man also denied seeing anyone run by.
Mason then found Vander Ploeg and Lowery and asked Lowery for a description of defendant. When Lowery described him, Mason told Lowery about the recent encounter and said that he thought defendant was the person at 186 Hawthorne Avenue. The three returned to that location but defendant was gone. Other officers joined the three and the hallway *512 and roof of 186 Hawthorne Avenue were searched. They found a black jacket, blood-stained overalls, blue jeans, a blue shirt, and blood-stained orange gloves. A .38 caliber revolver was discovered in the overalls. State Trooper Ronald Andrejack examined this weapon and determined that a firing malfunction had occurred which had caused a bullet not to discharge. Later that day the photographic arrays were presented to Lowery and Mason; both selected defendant's photograph. Lowery also accompanied F.B.I. agents and local officers to 123 South Munn Street in East Orange where he identified defendant from a group of four men as the person who shot at him from the Ford. Lowery then inspected defendant's hand and found puncture wounds which had been bandaged. King then was arrested. The Ford was seized and the contents inventoried by the police. Traveler's checks, a ski mask, and a .45 caliber handgun were found inside.
At trial, defendant denied taking part in any of the described events. His wife testified that the puncture wounds on his hands resulted from shovelling snow. As noted, King was convicted of all counts but Count Eight.

I
Defendant's motion to dismiss the indictment on the ground that the State violated N.J.S.A. 2C:1-11 by pursuing this prosecution subsequent to his federal bank conviction robbery of the Cranford Bank was denied by Judge Beglin on May 15, 1984. Defendant asserts that this denial was error. This contention has no merit.
There is no question that under the Federal Constitution a State may prosecute a defendant for conduct which was already charged in either a federal indictment or an indictment from another state because of the concept of "dual sovereignty." U.S. v. Lanza, 260 U.S. 377, 43 S.Ct. 141, 67 L.Ed. 314 (1922); Heath v. Alabama, 474 U.S. 82, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985). "The dual sovereignty doctrine is founded *513 on the common law conception of crime as an offense against the sovereignty of the government. When a defendant in a single act violates the `peace and dignity' of two sovereigns by breaking the laws of each, he has committed two distinct `offences'." Heath, 474 U.S. at ___, 106 S.Ct. at 437, 88 L.Ed.2d at 394. N.J.S.A. 2C:1-11 has been described by our Supreme Court as a drastic curtailment of the "dual sovereignty" doctrine. State v. Goodman, 92 N.J. 43, 51 (1983); see generally, Model Penal Code and Commentaries, § 1.10 at 167 (A.L.I. 1985).
However, defendant's point on this appeal is not one of a double-jeopardy bar under the Federal or State Constitutions but, instead, under N.J.S.A. 2C:1-11(a) which states
When conduct constitutes an offense within the concurrent jurisdiction of this State and of the United States, a prosecution in the District Court of the United States is a bar to a subsequent prosecution in this State under the following circumstances:
a. The first prosecution resulted in an acquittal or in a conviction, or in an improper termination as defined in section 2C:1-9 and the subsequent prosecution is based on the same conduct, unless (1) the offense of which the defendant was formerly convicted or acquitted and the offense for which he is subsequently prosecuted each requires proof of a fact not required by the other and the law defining each of such offenses is intended to prevent a substantially different harm or evil or (2) the offense for which the defendant is subsequently prosecuted is intended to prevent a substantially more serious harm or evil than the offense of which he was formerly convicted or acquitted or (3) the second offense was not consummated when the former trial began;
Of course subsection (a)(3) has no applicability to the present case, but defendant contends that subsections (a)(1) and (2) are also inapplicable. In fact, what King actually argues is that the conduct with which he was charged was a continuing course of events which was more properly the subject of a single federal indictment. What such an argument ignores is the language of N.J.S.A. 2C:1-11(a)(1) which mandates that the offense charged by the State requires proof of a fact not required by the federal indictment and vice versa and is aimed at a substantially different harm. This is the case here: assault and attempted murder on the Garden State Parkway is distinct from bank robbery in Cranford. As Judge Beglin *514 observed at the hearing, the conduct charged by the State involved only activity after the bank was robbed while the federal indictment dealt with the robbery itself and the acts leading up to it. In other words, as he stated, the State indictment charged "separate conduct that took place subsequent to and after the events within the bank had been completed.... [The federal charges] did not deal with conduct subsequent to the completion of the robbery." Thus, since different facts were needed to support the State charges, N.J.S.A. 2C:1-11(a)(1) allows the State prosecution to proceed.
But, as Judge Beglin pointed out, the analysis need not end there. N.J.S.A. 2C:1-11(a)(2) also allows this State prosecution to proceed in spite of the Federal conviction because the statutes "by their very nature within the factual circumstances of this case, are intended to prevent quite different harms and evils, each of which is substantial"  evils which cannot be described as "less important to society than the robbing of a bank." The attempted murder of law enforcement officials as well as the unlawful possession of firearms and the other crimes charged here were arguably substantially more serious than bank robbery when viewed in light of the physical danger to the public which their commission created.
The defendant also raises, for the first time on this appeal, a claim of prosecutorial vindictiveness which, like his N.J.S.A. 2C:1-11 claim, has no merit. The only case-law he presents to support this claim is State v. Gregory, 66 N.J. 510 (1975), which deals with a completely different situation. In Gregory the possible charges, sale of a CDS and possession of a CDS with intent to distribute, both arose out of the same specific incident  a sale to an undercover officer, the resulting arrest of defendant and the immediate seizure of his supply of heroin in a nearby room. No analogy can be drawn between the facts in that case and this one. Certainly no direct evidence of prosecutorial vindictiveness was presented by defendant and the events here can easily be broken up into two separate *515 occurrences to allow us to make any judgment that the prosecutor was vindictive in his actions against King, especially since this claim was never raised in the Law Division.

II
Prior to trial defendant requested a two-month continuance because of what he alleged was prejudicial pretrial publicity. He informed the judge that an article had appeared on the front page of The Newark Star Ledger with the headline "Pike Trooper Slain, Crash Kills Suspects." The article recited details of the death of a State Trooper, allegedly killed by two black males who were killed themselves when their car crashed following a high-speed chase. Similar news accounts also appeared in the New York Post and New York Daily News. King claimed that his trial would be irreparably tainted by these stories and that it would be impossible to select a fair and impartial jury because of the publicity surrounding the other killing.
"The granting of a continuance is a matter exclusively within the province and sound discretion of the trial judge, and should not be upset unless it appears from the record that the defendant suffered manifest wrong or injury." State v. Lamb, 125 N.J. Super. 209, 213 (App.Div. 1973). No such manifest wrong occurred here. Although defendant correctly asserts that at the time of the trial he was incarcerated, serving a sentence for the related federal conviction, and was not a danger to the community, defendant's concerns are not the only ones which the judge must consider in this situation. The prosecutor argued that if the trial were postponed he would have difficulty re-arranging schedules for witnesses who were traveling from Washington, D.C. Also, most importantly, as Judge Wolin pointed out, the only similarity between the two cases is that a State Trooper was involved in each. Moreover, Trooper Negron had been slain as he approached a disabled vehicle on the northbound New Jersey Turnpike in East Windsor Township. *516 The present case involves a bank robbery and subsequent chase, a shooting while trying to elude pursuing police officers. As Judge Wolin stated, this was "hardly the same type of situation" as the Negron slaying. We agree. To do otherwise would give far too much weight to unsubstantiated claims of prejudice while ignoring the schedules of witnesses and the lack of substantial similarity between the cases. Judge Wolin fulfilled his duty in this case by instructing the jury to disregard and avoid reading any news accounts relevant to the trial or its issues. He had no duty to otherwise poll the jury especially absent "evidence of any juror's actual reading of the material." State v. Reddy, 130 N.J. Super. 14, 18 (Law Div. 1974), aff'd 137 N.J. Super. 32 (App.Div. 1975).

III
During testimony by Officer Lowery the State sought to admit a taped recording of Lowery's high speed chase along the New Jersey Turnpike. Over defense counsel's objections, the judge ruled the tape admissible so that the jury would "have insight as to the atmosphere and the conditions that were prevailing at the time of the chase engaged in by Officer Lowery." Defendant now contends that both Evid.R. 4 and 20 prohibit this evidence from being admitted.
No hearing under State v. Driver, 38 N.J. 255, 287 (1962), on conditions of admissibility was held, but it is undisputed that Driver hearings may be waived. State v. Rockholt, 186 N.J. Super. 539, 547 (App.Div. 1982). As the State points out in its brief, "In this case, defense counsel did not request a hearing because the tape recording obviously met the requirements of State v. Driver".
We address defendant's contention that the admission of the recording violated the prohibition of Evid.R. 20 that "a prior consistent statement shall not be admitted to support the credibility of a witness except to rebut an express charge or implied charge against him of recent fabrication." Defendant, of *517 course, views the tape as a consistent statement by Lowery used to improperly rehabilitate his credibility which had not been attacked. Other states have admitted tape recordings of criminal episodes into evidence. State v. Price, 365 N.W.2d 632, 635 (Iowa Ct. App. 1985) (police dispatcher's tape of attempted murder); Piva v. General American Life Ins., 647 S.W.2d 866, 876-877 (Mo. Ct. App. 1983) (police dispatcher's tape of burglary); Curtis v. State, 629 S.W.2d 231 (Tex. Ct. App. 1982) (police dispatcher's tape of rape in progress); Porter v. State, 623 S.W.2d 374, 382-385 (Tex. Crim. App. 1981) (dispatcher's tape of police officer's killing admitted in capital murder case); Commonwealth v. Glover, 266 Pa.Super. 531, 405 A.2d 945 (1979) (tape recording of shooting and rape); State v. Smith, 85 Wash.2d 840, 540 P.2d 424 (1975) (tape recording of gun fire, running, shouting and victim's screams admitted in murder case). We agree with these authorities.
Although not admissible to bolster Lowery's credibility, the tape was properly admitted as independent evidence of what was going on during the chase. It was an accurate, though dramatic, reproduction of the criminal episode which corroborated the State's testimonial version. It appears merely fortuitous that Lowery was both the person on the stand and the person on the tape; therefore Evid.R. 20 seems inapplicable. We note, however, that the judge's comment that the tape was "being played for the purpose not to corroborate the testimony of Officer Lowery but to show the atmosphere as it was occurring at the time so that they [the jury] can gauge the credibility of Officer Lowery," (emphasis added) was not made in the presence of the jury. Fortunately, by the time he gave his jury instruction concerning the tape the judge had properly thought through the matter and restricted the admissibility of the tape to use as independent evidence to allow insight into the "atmosphere" of the car chase. This use is analogous to a movie of a criminal episode, which would certainly be admissible despite the presence of witnesses in the film itself. The witnesses' presence would be merely a coincidence and not a *518 reason to render the movie inadmissible as a prior consistent statement under Evid.R. 20.
Finally we address the admissibility of the tape under Evid.R. 4. Once again, the previously cited out-of-state cases seem persuasive that this is highly probative evidence which ordinarily should be admissible. In fact, any argument by the defendant concerning actual prejudice is unpersuasive. He is really arguing that the tape is of little use to the jury since, no matter how authentic, it deals with a shooting in which he was not involved. This, however, is a weight of the evidence issue left more properly to the jury.

IV
Without any objection from defendant, F.B.I. agent Mark Babyak, an expert in forensic serology, testified as to certain isoenzyme tests which were performed on blood found on overalls and gloves which were discovered at 186 Hawthorne Avenue where defendant allegedly had been seen sweeping. Defendant now contends that Judge Wolin erred by not excluding this evidence because of its highly prejudicial and unreliable nature. However, this objection is without merit, even disregarding defendant King's failure to object below.
Expert testimony is admissible if (1) the intended testimony concerns "a subject matter that is beyond the ken of the average juror," (2) the field in question is "at a state of the art such that an expert's testimony could be sufficiently reliable," and (3) the witness has "sufficient expertise to offer the intended testimony." State v. Kelly, 97 N.J. 178 (1984); Evid.R. 56. Only (2) is at issue here since isoenzyme testing is obviously beyond the "ken" of an average juror and defendant does not contend that Babyak was unqualified to be an expert  only that the process itself was too unreliable to allow the results to be relied upon.
We disagree. The same isoenzyme test was considered reliable in State v. Pearson, 234 Kan. 906, 678 P.2d 605, 609-611, 618 (1984). There the expert seriologist testified that, based upon studies showing the percentage of the population *519 having each of the enzyme factors, only 0.6% of the population would have the victim's combination of blood factors, so chances were high that the blood found on defendant's jeans and boots was that of the victim. Similar probability factors were testified to in the present case. Agent Babyak claimed that only one out of 100 blacks would have the characteristics manifested on the overalls and that King matched these characteristics. Of course, King asserts that such a statistic assumes that the perpetrator was black and that such an assumption is improper. However, his argument is one made more properly to the jury. All the evidence presented concerned black males in the fleeing vehicle so it would not be unreasonable for Babyak's probability testimony to center on black persons also. Whether or not the jury chose to believe that the perpetrators were black is a separate issue from whether the blood tests were admissible evidence. Since substantial evidence was presented as to the former issue it does not seem inappropriate for Babyak's testimony only to have dealt with blacks.
The isoenzyme procedure itself is commonly referred to as the Multi-System analysis and tests for six enzyme systems (EAP, AK, ADA, PGM, EsD AND GLO-1). The results are then compared to the general population (in this case the general black population) and a figure is arrived at which represents the percentage of the population which has this particular enzyme. From this record, Babyak appears to know what he was talking about and his description of the procedure suggest that the test is much more scientifically valid, than the use of hypnosis to refresh the recollection of a witness, a technique rejected by the Supreme Court in State v. Hurd, 86 N.J. 525 (1981), because the procedure is too susceptible to suggestibility and tampering. Hurd makes it clear that the trial judge's decision should stand unless unsupported by credible evidence. There is certainly as much evidence here as there was to support the admission of H.L.A. blood test results in Malvasi v. Malvasi, 167 N.J. Super. 513 (Ch.Div. 1979). H.L.A. testing is now aproved in many states. All of these procedures are susceptible *520 to criticism but a jury is free to disregard this evidence as they see fit. This is even true of the 43% figure which was testified to by Babyak as the applicable percentage of blacks who would have the enzyme characteristics found on the gloves. Simply because this figure is rather high is no reason to exclude it if the test procedure is a valid one. The jury would probably give this type of evidence much less weight than a figure of 1% or 0.6%.
King seems to feel that, because this evidence is of high probative value to the State's case, it must also be found to be highly prejudicial, but all damaging evidence is prejudicial. The prejudice merely must not be "undue" and must not substantially outweigh the probative value of the evidence. Here the probative value is high and the prejudicial value is no more than can be expected from any damaging scientific evidence.

V
Defendant contended before trial and also argues on appeal that he was denied effective assistance of counsel because his attorney "refused to file motions ... interview my witnesses ... [and] petition the federal government for documents that are relevant to this case." Under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and State v. Fritz, 105 N.J. 42 (1987), a two-part test must be met to support any claim of ineffectiveness of counsel. First, the defendant must show a clear deficiency or mistake by counsel and then he must demonstrate that the error was so serious that a different result would have occurred at trial but for the deficient performance by counsel. This is a meritless issue.
King's attorney testified at the hearing on his competency in the Law Division that he had adequately prepared for trial. After hearing testimony that the attorney went so far as to interview toll collectors on the Garden State Parkway and consulted with the prosecutor and reviewed the discovery to make sure he had everything he was entitled to, Judge Wolin *521 concluded that counsel should not be removed for deficient performance. We agree. Never did defendant specify exactly what motions he felt counsel should have filed or what extra discovery he felt should have been obtained. Such empty, groundless accusations do not satisfy Strickland and Fritz.

VI
Defendant next contends that his aggregate 30-year sentence with a 15-year mandatory minimum was excessive.
Defendant has prior in-state and out-of-state convictions for armed robbery as well as a conviction on the underlying robbery charge in this case. This fact led Judge Wolin to conclude that "Mr. King impresses me as a gentleman who prefers to make his livelihood as a professional criminal, as a professional robber." He found that the aggravating factors in the case were: there is a risk that King will commit another offense; the extent of his prior record; the fact that the crime was committed against a law enforcement official; and, finally, the need for deterring King and others from violating the law. The judge found that these four aggravating circumstances substantially outweighed the sole mitigating factor, that imprisoning defendant would place an extreme hardship on him and his family. Certainly all of these findings are supported by substantial credible evidence in the record and, thus, N.J.S.A. 2C:43-6(c) authorizes the extended term on count five while N.J.S.A. 2C:43-7(c) allows the length of that term to be raised to 20 years. Also N.J.S.A. 2C:43-6(b) authorizes the imposition of a minimum term in this case since the aggravating factors were found to substantially outweigh the mitigating factor.
However, the imposition of a consecutive prison term on Count Eleven conflicts with applicable sentencing law. Although decided after defendant was sentenced, State v. Yarbough, 100 N.J. 627, 644 (1985), provides guidance as to the relevant considerations which must be made before imposing a consecutive sentence:
(a) the crimes and their objectives were predominantly independent of each other;
(b) the crimes involved separate acts of violence or threats of violence;

*522 (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
(d) any of the crimes involved multiple victims;
(e) the convictions for which the sentences are to be imposed are numerous.
Although we make no claim as to the retroactivity of Yarbough's requirement that the judge specifically list his reasons for imposing a consecutive term, the factors which Yarbough enumerates for considering whether a consecutive term is appropriate have long been valid sentencing considerations in New Jersey. They are pertinent here. The same gunshots were used to prosecute both counts of attempted murder and concurrent rather than consecutive sentences thus are more appropriate. The imposition of maximum sentences seem appropriate considering that defendant's crimes were particularly heinous since the shoot-out and chase occurred in highway traffic and could have endangered the lives of more than just the two officers. However, the consecutive terms for attempted murder to us clash with Yarbough's general guidelines. This is especially true because the aggregate 15-year mandatory-minimum to 30-year-maximum term was imposed consecutively to his 30-year federal sentence for the bank robbery, which defendant is currently serving at Fort Leavenworth federal prison. We therefore direct that the ten-year sentence with a five-year minimum on Count Eleven for attempted murder of State Trooper Kornelius Vander Ploeg be imposed concurrently to the extended 20-year term with ten-year mandatory minimum on Count Five for attempted murder of Officer John Lowery.
In conclusion, we find defendant's contentions of error in the admission of the in-court and out-of-court identifications to be clearly without merit. R. 2:11-3(e)(2).
The judgment of conviction and the sentence, as modified on Count Eleven, are affirmed.