# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 04-2539

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

PAUL A. KRUEGER,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 03 CR 182—**William C. Griesbach**, *Judge.*

———————

ARGUED FEBRUARY 15, 2005—DECIDED JULY 28, 2005

———————

Before BAUER, ROVNER, and WILLIAMS, *Circuit Judges.*

ROVNER, *Circuit Judge.* When defendant-appellant Paul Krueger was stopped for speeding, Wisconsin authorities discovered over two kilograms of marijuana in his truck. Krueger was initially charged in state court for trafficking in marijuana, but the state case was dismissed after federal authorities announced their intent to prosecute Krueger for that offense. Shortly after he was taken into federal custody and at the invitation of federal agents, Krueger waived his right to remain silent and gave a detailed statement

regarding his drug trafficking. Krueger later moved to suppress that statement, contending that because he had already invoked his Sixth Amendment right to an attorney as to the state charges, federal agents were barred from questioning him without an attorney present. *See Michigan v. Jackson*, 475 U.S. 625, 106 S. Ct. 1404 (1986). The district court denied the motion to suppress. R. 25, 33. Krueger subsequently decided to plead guilty to possessing marijuana with the intent to distribute, while reserving the right to appeal the Sixth Amendment question insofar as his self-incriminating statement had an impact on the district court's sentencing decision. At sentencing, the district court found that Krueger was responsible for distributing between 100 and 400 kilograms of marijuana and ordered Krueger to serve a prison term at the low end (57 months) of the range specified by the U.S. Sentencing Guidelines.

Krueger appeals, contending because his statement to the federal agents was taken in violation of his Sixth Amendment right to counsel it should have been suppressed, and also that his sentence is plainly erroneous under *United States v. Booker*, 125 S. Ct. 738 (2005). We conclude that we need not decide whether Krueger's statement was taken in violation of Krueger's Sixth Amendment rights, because even if it was, the district court was nonetheless free to consider it for sentencing purposes. As for Krueger's sentence, we shall direct a limited remand to the district court so that it may determine whether it would be inclined to sentence Krueger to a lesser prison term knowing in light of *Booker* that the Sentencing Guidelines are advisory rather than mandatory. *See United States v. Paladino*, 401 F.3d 471, 483-84 (7th Cir. 2005).

## I.

### A. Admitted Facts as to Krueger's Guilt

We begin with a description of the facts that led to Krueger's arrest and that underlie his conviction. Krueger admitted nearly all of these facts in his written plea agreement. R. 34.

Marinette County, Wisconsin law enforcement officers received information from a confidential informant ("CI") that Krueger traveled to Milwaukee every two weeks to purchase marijuana and transported it back to Marinette County in northeastern Wisconsin, making stops along the way to sell to customers in the Outagamie and Marinette County areas. According to the CI, Krueger had bragged about dealing 450 pounds of marijuana per year. On June 24, 2003, the CI advised Marinette County Deputy Sheriff Rick Berlin that on the morning of June 25, Krueger would be returning to Marinette County from Milwaukee in his truck with a large quantity of marijuana. Deputy Berlin subsequently relayed that information to his patrol officers, along with a description of Krueger's truck and an instruction to "make your own case" (i.e., find a justification for stopping the vehicle) if the truck was spotted.

On the morning of June 25, 2003, Deputy Barry Degnitz was conducting stationary radar surveillance in Marinette County and conducted a traffic stop of Krueger's vehicle, which was traveling above the posted speed limit. Degnitz advised dispatch that he had stopped Krueger's vehicle. He then approached the driver, who identified himself as Krueger. While Degnitz was running Krueger's license and vehicle information through the computer in his squad car, Deputy Jamie Curran along with her drug-detecting canine, a Belgian Malinois by the name of Corey, and Deputy Berlin arrived at the scene. Krueger was asked to step out of his vehicle so that the dog could sniff around the vehicle's exterior for drugs. When the canine exhibited interest in

the truck, Berlin asked Krueger if there were any drugs in the vehicle. Krueger initially denied having any drugs but eventually admitted that he had some "smoke" in the pocket of his shirt located inside the cab of the truck. Degnitz searched the cab and found marijuana and a pipe in the location Krueger had described. Krueger was then placed in the backseat of Degnitz's vehicle.

Corey the canine had "alerted" to both the passenger door of the truck and the driver's side of the tailgate. When he was placed on the bed of the truck, Corey pushed the cover off of a cooler located in the back of the truck. The cooler was removed from the truck bed and the canine again alerted to the container by scratching. A subsequent search of the cooler revealed a .357 revolver, wrapped in an article of clothing. Located directly beneath the gun was a backpack containing five large plastic bags of marijuana (with an approximate total weight of 4.8 pounds), as well as another plastic bag containing $3,310.56 in cash.

Berlin advised Krueger of his Miranda rights, which he verbally agreed to waive. Krueger stated that the marijuana in his vehicle was for his personal use, although he refused to identify his source. He admitted that there were a couple of bags of marijuana at his residence but stated "it was all shake." (According to *Wikipedia*, a free-content online encyclopedia, "shake" is a term used to describe the small bits of marijuana, usually leaves, that break off and accumulate at the bottom of a plastic bag containing marijuana when the bag is handled roughly. *See* http://en.wikipedia.org; *see also* R. 19 at 78.) After Krueger refused to consent to a search of his residence, Berlin obtained a search warrant. During the search of the residence, deputies recovered a total of 1.8 pounds of marijuana individually packaged in smaller quantities in plastic bags and other containers along with various paraphernalia related to marijuana trafficking and consumption, including scales and numerous plastic ziplock bags of multiple sizes.

B.  Krueger's Uncounseled Statement as to his Marijuana
     Trafficking

Following his arrest on June 25, 2003, Krueger was
initially charged in Wisconsin state court with trafficking
in marijuana. An attorney with the state public defender's
office was assigned to represent Krueger and did, in fact,
represent him in the state proceeding.

Federal authorities took an interest in the case, however,
after Marinette County officials referred the matter to
Special Agent Kenneth Handy of the federal Bureau of
Alcohol, Tobacco, Firearms and Explosives ("ATF") and
Handy in turn referred it to the United States Attorney for
the Eastern District of Wisconsin. The U.S. Attorney
eventually advised the Marinette County District Attorney
that he would be pursuing federal charges against Krueger
for the same conduct underlying the state charge. On
August 7, 2003, a U.S. Magistrate Judge issued a federal
warrant for Krueger's arrest pursuant to a sworn criminal
complaint charging him with possessing marijuana with the
intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1)
and 841(b)(1)(D), as well as possessing a firearm in further-
ance of a drug trafficking crime in violation of 18 U.S.C.
§ 924(c)(1). R. 1, 4.

On the morning of August 8, 2003, Krueger appeared for
a hearing in the Marinette County District Court, where the
state charges against him were dismissed. Immediately
after that proceeding, Krueger was arrested on the federal
charges. A Marinette County deputy sheriff then drove
Krueger to Green Bay, Wisconsin, where he was transferred
to the custody of ATF Special Agents Handy and Sandra
DeValkenaere. Deputy Berlin, who had followed his col-
league and Krueger to Green Bay, joined the ATF agents as
they walked Krueger through the initial stages of federal
processing.

Between 1:00 and 1:30 p.m., once Krueger had been in-terviewed by a federal pretrial services officer, Handy and DeValkenaere drove him to the Brown County Courthouse, where Handy had arranged for Krueger to be held pending his first appearance in U.S. District Court at four o'clock that afternoon. They parked their vehicle on the street in front of the courthouse and allowed Krueger to begin eating a lunch that Berlin and DeValkenaere had obtained for him from McDonald's. While Krueger ate, Agent Handy advised him of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966), and inquired whether he would be willing to cooperate with the ATF's investigation by identifying his source of marijuana and other people that he knew to be involved in drug trafficking, including his customers.

Krueger refused to cooperate at first, but eventually agreed to name one individual. Handy and DeValkenaere told Krueger they were not interested in piecemeal coopera-tion, however. At several points, Handy threatened to terminate the discussion and take Krueger to his holding cell. "Fine, you're done with your lunch, let's go," he said finally. R. 19 at 101. But as Handy opened his car door and began to get out of the vehicle, Krueger relented and agreed to tell the agents what they wanted to know. At that point, the agents invited Deputy Berlin, who had followed them to the courthouse and whose car was parked next to theirs, to join them, as he was likely to be more familiar with anyone that Krueger might implicate. Krueger was again advised of his *Miranda* rights, and he waived those rights, including his right to the advice of counsel, by signing a written WAIVER OF RIGHT TO REMAIN SILENT AND OF RIGHT TO ADVICE OF COUNSEL form supplied by the agents. That form included the following statement:

> I do not want a lawyer at this time. I understand and know what I am doing. . . . I hereby voluntarily and

> intentionally waive my rights, and I am willing to make a statement and to answer questions.

Gov. Ex. 1 from evidentiary hearing held on Oct. 10, 2003.

Krueger then spoke with the officers for approximately two hours. During the interview, he discussed the extent of his marijuana trafficking, revealing that for a period of between five and six years, he had been purchasing five to seven pounds of marijuana every other week from an Hispanic individual named "Luis" who lived on the south side of Milwaukee. Krueger also identified eight people, including his son, who regularly purchased marijuana from him.

Krueger appeared in district court later that afternoon and was released on a cash bond.

## C. Motion to Suppress

Approximately three weeks later, a federal grand jury indicted Krueger on a single charge that he had knowingly possessed marijuana with the intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D). R. 8.[1] Krueger subsequently moved to suppress the statement that he made on August 8, 2003, after he was transferred from state to federal custody, contending that the statement was obtained in violation of his Sixth Amendment right to counsel. Krueger argued that because he was represented by an attorney on the state charges that were dismissed earlier that day, because the federal authorities were in communication with state authorities regarding Krueger and were on notice that he was represented in the state

---

[1] The government decided not to pursue the section 924(c)(1) firearm charge against Krueger after concluding that his possession of the firearm was not in furtherance of his marijuana trafficking.

proceeding, and because the federal complaint pursuant to which he was transferred to the custody of Special Agents Handy and DeValkenaere was based on the same facts as the state charges, Krueger had effectively invoked his right to counsel as to the federal charge, thereby precluding the agents from asking Krueger to speak with them, notwithstanding his subsequent decision to waive his right to counsel. *See Michigan v. Jackson, supra*, 475 U.S. at 636, 106 S. Ct. at 1411 ("if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid"). R. 23 at 5-7.

After conducting an evidentiary hearing on the motion to suppress, Magistrate Judge Patricia Gorence recommended that the district court deny the motion, R. 25 at 18-20, and the district judge accepted that recommendation, R. 33 at 12-23. Judge Griesbach rejected Krueger's contention that his prior invocation of his right to counsel in the state proceeding extended to the factually related federal complaint that brought him into the custody of Special Agents Handy and DeValkenaere. R. 33 at 18. Consequently, *Michigan v. Jackson* would have barred the federal agents from initiating a discussion with Krueger only if his right to counsel had already attached in the federal case *and* Krueger had invoked that right. Although the court agreed that Krueger's right to counsel had attached with the filing of the federal criminal complaint, Krueger had not yet invoked that right when he was taken into federal custody and awaiting his first appearance in the district court. R. 33 at 21-23. As a result, Handy and DeValkenaere were free to question him unless and until he did request an attorney. Krueger's written waiver of his Sixth Amendment right to counsel was therefore valid. R. 33 at 23.

D.  Plea Agreement

Following the denial of his motion to suppress, Krueger entered into a detailed written plea agreement with the government. R. 34. In that agreement, the parties "agree[d] to recommend to the sentencing court that, based on evidence available to the government and admissible against the defendant, the government is able to establish by a preponderance of the evidence that the drug quantity attributable to the defendant is at least 100 kilograms of marijuana." *Id.* at 5-6 ¶ 14. However, Krueger reserved "the right to raise on appeal the issue of whether or not the district court may properly rely upon the defendant's August 8, 2003 statement in determining the applicable Sentencing Guideline range, given the Sixth Amendment claim raised by the defendant in pretrial motions." *Id.* at 9 ¶ 27; *see also* R. 48 at 8.

At the conclusion of a change-of-plea hearing on December 19, 2003, the district court accepted Krueger's plea of guilty.

E.  Sentencing

For most narcotics offenses, the Sentencing Guidelines prescribe a base offense level tied to the quantity of narcotics that the defendant's relevant criminal conduct involved. *See* U.S.S.G. §§ 2D1.1(a)(3), 2D1.1(c). The pre-sentence report ("PSR") prepared for Krueger's sentencing included a finding that Krueger was responsible for trafficking at least 100 but less than 400 kilograms of marijuana, a finding that resulted in a base offense level of 26. PSR at 7 ¶ 27; *see* U.S.S.G. § 2D1.1(c)(7). The parties did not disagree as to the quantity of marijuana attributed to Krueger: his own statement of August 8, indicating that he had purchased between five and seven pounds of marijuana every other week for five to six years, supported a finding that he was responsible for a minimum of 295 kilograms; and it was

no doubt for that reason that Krueger had stipulated in the plea agreement that the government could prove him responsible for at least 100 kilograms of marijuana. R. 34 at 5-6 ¶ 14. The focus of the parties and the court at sentencing instead focused on whether there was a basis for the quantity finding independent of Krueger's August 8 statement.

The government took the position that the court did not need to rely on Krueger's August 8 statement in order to find him responsible for at least 100 kilograms of marijuana. The government reasoned that the following evidence, obtained from various sources other than Krueger's statement and set forth in the PSR, was sufficient to establish that he had distributed at least 100 kilograms of marijuana:

(1) 2.191 kilograms of marijuana was found in Mr. Krueger's truck at the time of his arrest, and another 1.883 kilograms was discovered when his home was searched later that same day. In addition, $3,310.56 was found in the truck at the time of Krueger's arrest; and assuming that the cash represented the proceeds of marijuana sold at a price of $90 per ounce (the price identified by one of Krueger's customers), it corresponded to another 1.043 kilograms of marijuana, for a total of 5.117 kilograms. PSR at 5 ¶ 18.

(2) The confidential informant who tipped off Wisconsin authorities to Krueger had indicated that Krueger had been traveling to Milwaukee every other week for several months and purchasing approximately 20 pounds of marijuana on each occasion. Excluding the day of Krueger's arrest, and counting backward for a period of three months, these biweekly 20-pound purchases would yield a total of 54.43 kilograms. PSR at 5 ¶ 19.

(3) When Krueger made his biweekly trips to Milwaukee to purchase marijuana, his habit was to stop along the way and stay with longtime friend Reuben Stoegbauer in or near Appleton, Wisconsin. On August 27, 2003, several weeks after Krueger had given his statement, one or more law enforcement officials went to speak with Stoegbauer. Recall that a gun was found in Krueger's truck at the time of his arrest, and this formed the basis for the charge in the original complaint against Krueger that he had possessed a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1). However, Krueger evidently insisted that he had only recently acquired the gun and that he planned to hang it on a wall—in other words, that his possession of the gun was unrelated to his marijuana trafficking. *See* R. 49 at 17. Krueger apparently suggested that Stoegbauer could back him up on this. When officials followed up with Stoegbauer, Stoegbauer evidently told them enough to convince the government to drop the section 924(c) firearm charge. *See id.* at 17-18. More pertinently with respect to the drug quantity calculation, Stoegbauer also volunteered that he was one of Krueger's marijuana customers. Stoegbauer revealed that he had been purchasing four-ounce quantities of marijuana from Krueger every other week for ten years at $90 an ounce. Those purchases added up to 29.484 kilograms of marijuana. Stoegbauer also provided officials with the names and addresses of six other individuals whom he identified as regular customers of Krueger. PSR at 5-6 ¶ 20.

(4) The foregoing quantities of marijuana totaled roughly 90 kilograms. To reach the 100-kilogram threshold, the government cited two additional

pieces of evidence. First, the confidential informant who brought Krueger to the attention of the authorities had said that Krueger bragged to him about dealing 450 pounds (204 kilograms) of marijuana per year. Second, Stoegbauer had identified six other individuals who were regular customers of Krueger. Although the government declined to derive a particular drug quantity from either piece of evidence, it reasoned that one could fairly infer from both that Krueger was responsible for at least another ten kilograms of marijuana. PSR at 5-6 ¶ 20.

Krueger did not concede that the government's alternate evidentiary basis for the drug quantity determination was sufficient, apart from his August 8 statement, to support a finding that he was responsible for at least 100 kilograms.[2] However, he did not identify any particular shortcoming in the other evidence relating to his trafficking. At the sentencing hearing, Krueger's counsel was studiously neutral on the subject. It is evident from the attorney's remarks that Krueger wished to preserve his right to appeal the denial of the motion to suppress his August 8 statement and therefore did not want to concede that the court could hold him responsible for 100 or more kilograms of marijuana without relying on that statement. But Krueger's counsel again did not cite any particular flaw in the alternative basis that the government proffered for the 100-plus kilogram finding.

---

[2] In his written objections to the PSR, Krueger's counsel said that "I do not agree with all of the inferences and extrapolations in the [government's] alternative theory for relevant conduct . . . nor do I agree that the two theories are separable factually or legally." PSR, attachment (April 18, 2004 letter from defense counsel to probation officer) at 1-2.

For his part, Judge Griesbach inquired whether the alternative evidentiary basis for the drug quantity was truly independent of Krueger's August 8 statement. Stoegbauer gave his statement to the authorities after August 8, when Krueger himself had discussed his marijuana sales with federal agents; and by the time he was interviewed, Stoegbauer was aware that Krueger had been arrested. This caused the judge to wonder whether Stoegbauer might have known that Krueger had already revealed the extent of his marijuana trafficking. If he did know, then Stoegbauer might have been more forthcoming about Krueger's criminal activity than he otherwise would have been, and to that extent, Stoegbauer's statement might be viewed as the fruit of Krueger's August 8 statement. Neither Krueger's counsel nor the AUSA could shed any light on that possibility; neither attorney had spoken with Stoegbauer, and neither could say whether he knew how much Krueger had already told the ATF agents about his drug dealing.

After adopting the factual findings set forth in the PSR, Judge Griesbach determined that Krueger's relevant conduct included trafficking in excess of 100 kilograms of marijuana. R. 49 at 20. The judge noted that Krueger's August 8 statement alone supported a finding of at least 295 kilograms. *Id.* But the court also agreed that apart from Krueger's own statement, there was other evidence supporting a finding of at least 100 kilograms:

> I'm satisfied that the report of the CI as recounted in the pre-sentence report and the statement of Mr. St[o]egbauer would provide an alternate basis for me to conclude that the amount of marijuana that Mr. Krueger sold over the period of time leading up to his arrest was in excess of 100 kilograms. It was significantly in excess of that.

*Id.* The judge added the following qualification to his finding:

> Now I'm not making any determination as to whether Mr. St[o]egbauer's testimony would have been available absent Mr. Krueger's statement. I don't know all that.

> But I can making the finding and I will make the finding that even absent Mr. Krueger's statement, that the confidential informant and the statement recounted by Mr. St[o]egbauer would be another way in which to arrive at the relevant conduct.

*Id.* at 20-21.

The finding that Krueger had distributed in excess of 100 kilograms of marijuana resulted in a base offense level of 26 under the Sentencing Guidelines. U.S.S.G. § 2D1.1(c)(7). The Guidelines specified a two-level enhancement based on Krueger's possession of a firearm. *Id.* § 2D1.1(b)(1). Three levels were then subtracted based on Krueger's timely acceptance of responsibility (after the court granted the government's motion for the extra acceptance point). § 3E1.1. The resulting adjusted offense level of 25, combined with Krueger's criminal history category of I, called for a sentencing range of 57 to 71 months. However, the statutory maximum sentence was 60 months, thus confining the court's discretion to a range of 57 to 60 months. *See* § 5G1.1(c)(1).

Before imposing a sentence on Krueger, Judge Griesbach remarked on the limits of his discretion under the Guidelines, observing that "[c]ourts do not have discretion to sentence outside of the guidelines except under very rare circumstances" and that "these are the guidelines that I am to apply, and they prescribe a sentence within the range of 57 months to, as I said, 71 months, which is a little under five years to almost six years, but the [statutory] maximum here is five years." R. 49 at 24-25. When asked for their views, counsel for the government as well as Krueger urged the court to impose the minimum Guidelines sentence. *Id.* at 25, 27. The judge agreed with the parties that "the

minimal guidelines sentence here is appropriate." *Id.* at 31. Krueger was therefore ordered to serve a prison term of 57 months, followed by two years of supervised release. R. 42 at 2-3. The court also ordered Krueger to pay a fine of $500 and a special assessment of $100. *Id.* at 5.

## II.

### A. Sixth Amendment

*Michigan v. Jackson* holds that if the police initiate interrogation of a defendant after he has asserted his Sixth Amendment right to the assistance of counsel at an arraignment or a similar proceeding, any waiver by the defendant of his right to counsel for purposes of that interrogation is invalid. 475 U.S. at 636, 106 S. Ct. at 1411. In order for the *Jackson* prohibition to apply, two conditions must be met: first, the defendant's right to counsel must have attached, and second, the defendant must have invoked that right. *See United States v. Spruill*, 296 F.3d 580, 586-87 (7th Cir. 2002) (quoting *United States v. Avants*, 278 F.3d 510, 515 (5th Cir. 2002)); *United States v. McKinley*, 84 F.3d 904, 908 (7th Cir. 1996). Once these conditions are satisfied, *Jackson* precludes the police from initiating a discussion with the defendant outside the presence of his counsel, even if the defendant is amenable to their overtures.

The question presented in this case is whether a defendant's invocation of his right to representation in a state prosecution can trigger the *Jackson* bar against interrogation as to a subsequent federal prosecution on a related charge. There is no question that Krueger's right to counsel had attached and that he had invoked that right in Wisconsin state court: a public defender had been appointed for Krueger, and on the very day that the state charges against Krueger were dismissed in deference to the federal prosecution, Krueger appeared in court with his defender. As to the

state charges, then, the *Jackson* prohibition was in full force. But Krueger was not questioned about the state charge: when Handy and DeValkenaere initiated their discussion with Krueger, the state charges had been dismissed, and Krueger was awaiting his first appearance in federal court. A defendant cannot invoke his right to counsel once as to all crimes that the authorities might wish to question him about in the future, *McNeil v. Wisconsin*, 501 U.S. 171, 175, 111 S. Ct. 2204, 2207 (1991); rather, the Sixth Amendment right to counsel is offense specific, *ibid.*; *Texas v. Cobb*, 532 U.S. 162, 167-68, 121 S. Ct. 1335, 1340 (2001). Even if there is a factual relationship between prior and subsequent charges, *Jackson* will not necessarily prohibit the police from talking to the defendant about the later charge. *id.* at 168, 121 S. Ct. at 1340-41. Generally speaking, only if the two offenses may be considered the "same" crime for double jeopardy purposes might *Jackson* come into play. *Id.* at 173, 121 S. Ct. at 1343.

Without doubt, there is a substantial overlap between the state and federal crimes with which Krueger was charged, but the hurdle for Krueger is that the two sets of charges were brought by separate sovereigns. The Supreme Court has held that the Double Jeopardy Clause does not preclude both the federal and state governments from prosecuting a defendant based on the same set of facts, even if the charged crimes have virtually identical elements. *See Heath v. Alabama*, 474 U.S. 82, 89, 106 S. Ct. 433, 437-38 (1985) (coll. cases); *see also*, *e.g.*, *United States v. Ray*, 238 F.3d 828, 835 (7th Cir. 2001). Rather, pursuant to the doctrine of dual sovereignty,[3] each sovereign is free to charge the

---

[3] "The dual sovereignty doctrine is founded on the common-law conception of crime as an offense against the sovereignty of the government. When a defendant in a single act violates the 'peace and dignity' of two sovereigns by breaking the laws of each, he has

(continued...)

defendant under its own law. *Heath*, 474 U.S. at 88-90, 106 S. Ct. at 437-38. Because the Supreme Court has held that term "offense" has the same meaning for purposes of the *Jackson* Sixth Amendment analysis as it does for double jeopardy purposes, *Cobb*, 532 U.S. at 173, 121 S. Ct. at 1343, one might conclude that a defendant's invocation of his right to counsel as to a charge brought by a state government will not be treated as the invocation of his right as to the federal charge, irrespective of the common factual basis for the two charges. *See United States v. Avants*, 278 F.3d 510, 517 (5th Cir. 2002); *United States v. Coker*, 298 F. Supp. 2d 184, 190-91 (D. Mass. 2003); *contra United States v. Mills*, ___ F.3d ___, 2005 WL 1444145, at *1 (2d Cir. June 21, 2005) (concluding that "[u]nder *Cobb*, the Sixth Amendment right of counsel extends to offenses considered to be the "same offense" as those to which the right has already attached even when they are prosecuted by different sovereigns").

Still, the dual sovereignty doctrine may not pose an insurmountable obstacle for someone in Krueger's position: in *United States v. Red Bird*, 287 F.3d 709 (8th Cir. 2002), our colleagues on the Eighth Circuit concluded that *Jackson* precluded a federal agent from initiating an interview with the defendant about a possible federal charge when the defendant had already been charged with essentially the same crime in tribal court.

The defendant in *Red Bird* had been charged with rape, arraigned on that charge, and assigned counsel in tribal court when an FBI agent, with the assistance of a tribal investigator, located the defendant and initiated an interview with him regarding the rape allegation. (Because the

---

³ (...continued)
committed two distinct 'offences.' " *Heath*, 474 U.S. at 88, 106 S. Ct. at 437 (quoting *United States v. Lanza*, 260 U.S. 377, 382, 43 S. Ct. 141, 142 (1922)).

crime occurred on a Native American reservation, the federal government also had jurisdiction over the matter.) The defendant waived his *Miranda* rights and gave a statement to the FBI agent. He was subsequently charged with sexual abuse in federal court based on precisely the same facts underlying the rape charge in tribal court.

The district court suppressed his statement, concluding that the defendant's right to counsel had attached and had been invoked when he was arraigned on the rape charge in tribal court.[4] Both the tribal investigator and the FBI were aware of the pending charge in tribal court and knew that the defendant was represented in that proceeding, yet neither had contacted the defendant's attorney and sought permission to speak with the defendant. Thus, the FBI agent's subsequent interview with the defendant was barred by *Jackson*. *United States v. Red Bird*, 146 F. Supp. 2d 993 (D. S.D. 2001).

The Court of Appeals affirmed, rejecting the government's contention that because the federal sexual abuse charge was not the same charge as the rape charge in tribal court for double jeopardy purposes, it should be considered distinct for purposes of the Sixth Amendment as well. In the Eighth Circuit's view, because the tribal charge had triggered the federal inquiry, tribal authorities had "worked in tandem" with the FBI to investigate the rape, the elements of the tribal and federal charges were essentially the same, and because tribal sovereignty was unique and limited in nature, it was not dispositive that the two charges were brought by different sovereigns. *Id.* at 715. Like the district court, the Court of Appeals concluded that because the defendant's right to counsel had attached and been invoked in the tribal proceeding, *Jackson* precluded the FBI from instigating a discussion with him in the absence of his

---

[4] Under his tribe's constitution, Red Bird enjoyed a right to counsel in tribal court. 287 F.3d at 711.

counsel. *Id.* at 715-16. *Accord United States v. Bowlson*, 240 F. Supp. 2d 678, 683-84 (E.D. Mich. 2003) ("where the federal and state authorities' investigations were inexorably intertwined," *Jackson* barred federal agents from questioning defendant about a bank robbery with which he had already been charged, and as to which he was already represented by counsel, in state court, notwithstanding federal government's power to charge him separately for the same robbery).

The Second Circuit has likewise rejected the contention that the dual sovereignty doctrine renders overlapping federal and state charges distinct for Sixth Amendment purposes. *Mills*, 2005 WL 1444145. The court acknowledged *Cobb*'s holding that the term "offense" should be given the same meaning in the Sixth Amendment context as it is in the double jeopardy setting. *Id.*, at *4. The court also recognized that the Double Jeopardy Clause will not bar two sovereigns from separately charging a defendant based on the same set of facts, even when the charged crimes would amount to the "same offense" under *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180 (1932). *Mills*, 2005 WL 1444145, at *4. Nonetheless, the court found no support in *Cobb* for the notion that the dual sovereignty doctrine permits a defendant to be questioned as to a federal charge when he has already been charged with essentially the same crime in state court and his right to counsel has attached to the state charge:

> *Cobb* makes clear that Sixth Amendment violations are offense specific and, consequently, evidence obtained in violation of the Sixth Amendment is not admissible in subsequent prosecutions for the "same offense" as defined by *Blockburger*. The fact that *Cobb* appropriates the *Blockburger* test, applied initially in the double jeopardy context, does not demonstrate that *Cobb* incorporates the dual sovereignty doctrine: The text is used simply to define identity of offenses. Where, as

here, the same conduct supports a federal or a state prosecution, a dual sovereignty exception would permit one sovereign to question a defendant whose right to counsel had attached, to do so in the absence of counsel and then to share the information with the other sovereign without fear of suppression. We easily conclude that *Cobb* was intended to prevent such a result.

*Id.*, at *5; *see also* David J. D'Addio, Comment, *Dual Sovereignty and the Sixth Amendment Right to Counsel*, 113 Yale L. J. 1991, 1992 (2004) (arguing that dual sovereignty principles should not be imported into Sixth Amendment jurisprudence, because to do so "creat[es] the potential for cooperating sovereigns to circumvent a defendant's Sixth Amendment right to counsel").

The facts in this case make room for a similar theory. After Krueger was charged in state court, state officials referred the case to ATF Special Agent Handy and the U.S. Attorney for possible federal prosecution, and the U.S. Attorney elected to pursue federal charges against Krueger. Once a federal warrant was issued for Krueger's arrest, the state charges against Krueger were dismissed and he was immediately arrested on the federal warrant at the Marinette County Courthouse, driven to Green Bay by a state deputy, and delivered into the custody of federal agents. As Judge Griesbach observed, the transition between the state and federal prosecutions of Krueger was virtually seamless:

In essence, the United States Attorney, with the agreement of the Marinette County District Attorney, took over the prosecution of Krueger and the case was essentially transferred to federal court. The transfer was accomplished by the issuance of a federal arrest warrant and criminal complaint on August 7, 2003, followed by the dismissal of the state charges when Krueger appeared at the Marinette County Courthouse

> the following day. There was literally no lapse in time between the two prosecutions.

R. 33 at 20-21. Moreover, even after Special Agents Handy and DeValkenaere had taken custody of Krueger, at least one state official remained involved in the case. Recall that Deputy Sheriff Rick Berlin had followed Handy and DeValkenaere to the Brown County Courthouse, where Krueger was to be held pending his first appearance in federal court later, and had parked his car behind theirs. When Krueger finally agreed to be interviewed by the federal agents, Berlin was invited to join the interview as he was more likely to know the individuals that Krueger would implicate in his marijuana trafficking. These facts certainly give rise to the appearance of coordination between state and federal authorities. In view of that apparent coordination, an argument could be made along the lines of *Red Bird* that the federal charges, although brought by a different sovereign, were essentially the same ones that had been asserted against Krueger in state court for purposes of the Sixth Amendment. That would in turn suggest that Handy and DeValkenaere may have ran afoul of *Jackson* when they solicited Krueger's cooperation, for there is no doubt that Krueger's right to counsel had attached in the state proceeding and that Krueger had invoked that right.

However, this is not a subject that we need to explore further in this case. As a matter of prudence and restraint, we decide constitutional questions only if it is truly necessary to do so. *See, e.g.*, *United States v. Westmoreland*, 240 F.3d 618, 629 (7th Cir. 2001); *United States v. Bloom*, 149 F.3d 649, 653 (7th Cir. 1998). For the reasons that follow, we are satisfied that it is unnecessary to decide the Sixth Amendment question that Krueger's motion to suppress presented.

We note first that Krueger preserved his right to appeal the district court's ruling on this subject only insofar as his

August 8 statement affected his sentence. R. 34 at 9 ¶ 27. The district court relied on the August 8 statement as one of the bases for the drug quantity finding, but it also found that there was an alternate evidentiary basis for the finding. R. 49 at 20-21. The evidence underlying that alternate basis was set forth in the PSR, and the AUSA outlined that basis at the sentencing hearing. Although Krueger, through his counsel, did not concede that the cited evidence was sufficient, independent of his own statement, to support a quantity finding of at least 100 kilograms, neither did he identity any particular shortcoming in that evidence. The district court ultimately found that the evidence was sufficient to establish Krueger's responsibility for 100 or more kilograms apart from his August 8 statement. *Id.* at 20-21. True, the district court made no determination as to whether Stoegbauer's statement as to the extent of Krueger's trafficking would have been available had Krueger himself not already divulged that information to the ATF agents. *Id.* However, the record as it stands does not give us reason to doubt that Stoegbauer still would have given the agents that information. The evidence indicates that the authorities would have contacted Stoegbauer even in the absence of Krueger's August 8 statement, that Stoegbauer was immediately cooperative when visited by a federal agent, and that he readily gave statements that incriminated himself as well as Krueger. On its face, this evidence suggests that Stoegbauer's statement was not the fruit of Krueger's August 8 statement. The possibility that Stoegbauer might have known what his friend Krueger told the agents on August 8 about the extent of his marijuana dealing, and thus might have been more willing to incriminate Krueger, is not one that the evidence set forth in the PSR suggests, nor is it one that the parties (or, for that matter, the district court) raised in advance of the sentencing hearing. Had it been, Stoegbauer could have been summoned to testify on that point at sentencing. *See id.* at 8, 19. As it stands, the record gives us no reason to believe

that Stoegbauer's statement was in any way the result of or tainted by Krueger's August 8 statement.

But even if the record is as "muddy" on this point as Krueger suggests it is, Krueger Reply Br. at 1, there is yet another reason why we do not need to determine whether Handy and DeValkenaere interrogated Krueger in violation of his Sixth Amendment right to counsel. The premise of Krueger's argument is that if his August 8 statement was obtained illegally, the district court could not consider it for sentencing purposes. Yet, as the government has pointed out, that is not necessarily the case.

The exclusionary rule is, for the most part, inapplicable at the sentencing stage of a criminal prosecution. *See United States v. Brimah*, 214 F.3d 854, 858-59 (7th Cir. 2000) (joining nine other circuits in holding that "in most circumstances, the exclusionary rule does not bar the introduction of the fruits of illegal searches and seizures during sentencing proceedings"); *Del Vecchio v. Illinois Dep't of Corrections*, 31 F.3d 1363, 1388 (7th Cir. 1994) (en banc) (concluding that the exclusionary rule did not bar the consideration at sentencing of a confession that was allegedly procured in violation of the defendant's *Miranda* rights). Thus, sentencing judges, who operate under a charge to consider the broadest possible array of information about each defendant, *see* 18 U.S.C. § 3661; U.S.S.G. §§ 1B1.4, 6A1.3(a), may consider reliable evidence that was obtained illegally in fashioning an appropriate sentence. *See United States v. Westmoreland*, *supra*, 240 F.3d at 630; *United States v. Troxell*, 887 F.2d 830, 835 (7th Cir. 1989) (quoting *United States v. Plisek*, 657 F.2d 920, 926 (7th Cir. 1981)). Accordingly, even assuming that Krueger's August 8 statement was taken in violation of his Sixth Amendment right to counsel, the district court was nonetheless free to rely on that evidence in making the findings necessary to determine the sentencing range called for by the Sentencing Guidelines.

We have, it is true, left open the possibility that the exclusionary rule might apply at sentencing where the authorities have deliberately violated the defendant's constitutional rights for the purpose of acquiring evidence to boost his prospective sentence. *Brimah*, 214 F.3d at 858 n.4.; *but see United States v. Jewel*, 947 F.2d 224, 238 (7th Cir. 1991) (Easterbrook, J., concurring) (noting the near impossibility of showing that authorities obtained evidence specifically for use in sentencing, and going on to observe that "[i]t is awfully hard to see why motive should matter on either prudential or doctrinal grounds"). Krueger suggests that this might be what happened here: as he sees it, the aim of the August 8 interview was to gather evidence that the government could use to boost the drug quantity determination and thus his sentencing range. Krueger Reply Br. at 5. Prior to that interview, Krueger points out, he was known to be responsible for the three kilograms of marijuana that was found in his truck and in his residence; after the interview, the amount "ballooned" to over 100 kilograms. Krueger Reply Br. at 6. "Clearly, the purpose and result of the interview was to increase Krueger's sentence. What other purpose could it serve?" *Id.*

But the record lends little or no support to the notion that Handy and DeValkenaere deliberately violated Krueger's right to an attorney with the intent to gather evidence that would increase his sentence. In fact, the testimony concerning the August 8 interview suggests that the agents were primarily interested in having Krueger name other persons who were involved in his drug dealing. Indeed, that proved to be a sticking point between the agents and Krueger: Krueger did not want to implicate anyone else (or at most, one other person), whereas the agents were unwilling to talk with him unless he was willing to name others. Krueger ultimately relented, and when he did, Deputy Sheriff Berlin was invited to join the discussion because he was more likely to know the individuals that Krueger would

name. We do not suppose that the agents were blind to the sentencing ramifications of what Krueger told them about the extent of his marijuana sales. But the record as it stands does not suggest that they purposely trampled his constitutional rights in order to lengthen his prison sentence.

Thus, even if Handy and DeValkenaere did run afoul of *Michigan v. Jackson* and Krueger's right to the assistance of counsel when they questioned him on August 8, the district court was not precluded from relying on Krueger's statement at sentencing to ascertain the quantity of marijuana for which he was responsible. We leave for another day the question of whether and when *Jackson* might preclude interrogation as to a federal charge that is based on the same facts underlying a state charge as to which the defendant has already invoked his right to counsel.

## B. *Booker* and the Judge's Sentencing Determinations

For purposes of determining Krueger's offense level under the Sentencing Guidelines, the district court made certain factual determinations regarding Krueger's criminal conduct. These findings went beyond the facts to which Krueger had stipulated in his plea agreement and were rendered by the court based on a preponderance of the evidence. They obviously include the court's finding as to the total amount of marijuana for which Krueger was responsible as well as its finding that Krueger had possessed a firearm during the drug offense. Both findings had the effect of increasing Krueger's offense level and thus the Guidelines sentencing range. The Supreme Court's decision in *United States v. Booker*, *supra*, 125 S. Ct. 738, does not preclude a sentencing judge from making factual findings that have the effect of increasing the Guidelines sentencing range, but it does render the Guidelines advisory in order

to avoid the constitutional problem that mandatory application of the Guidelines otherwise would present. *See id.* at 750.

Krueger did not make a constitutional objection to the factfinding in which the district court engaged at sentencing. Although he arguably objected to the court basing its findings on facts other than those which he admitted in the plea agreement, *see* R. 49 at 7-8, he did not argue that the court was without the power to make such findings. Accordingly, Krueger forfeited the *Booker* challenge to his sentence that he makes on appeal, and our review is confined to one for plain error.

Nonetheless, the government concedes that, in retrospect, *Booker* error did occur and that the error was plain: the district judge sentenced Krueger believing that the Guidelines were mandatory. The pertinent question, then, is whether Krueger's substantial rights were affected by the error. *See* Fed. R. Crim. P. 52(b); *United States v. Lee*, 399 F.3d 864, 866 (7th Cir. 2005). We cannot answer that question without knowing whether the district court would have been inclined to sentence him more leniently had it known that the Guidelines were advisory rather than mandatory. *United States v. Paladino, supra*, 401 F.3d at 482. The judge's remarks at sentencing as well as the sentence it imposed suggest that he might have been so inclined. The judge made a point of remarking on his lack of discretion under the Guidelines, noting that the Guidelines had "shifted the focus of any criminal sentencing procedure from the normal concern and viewing of the individual, along with the seriousness of the offense . . ., to almost an academic . . . or abstract calculation on guidelines," R. 49 at 24; the court also sentenced Krueger at the bottom of the Guidelines range. We also note that the judge's sentencing discretion was even more confined here than it was in the usual Guidelines case by virtue of the statutory maximum term of five years. Under these circumstances, it is entirely

possible that had the judge realized that he had the discretion to sentence Krueger outside of the Guidelines range, he might have sentenced Krueger to a lesser period of time in prison than the 57-month term that he imposed. *See Paladino*, 401 F.3d at 482.

Pursuant to the course we outlined in *Paladino*, we therefore order a limited remand of the sentence to the district court so that the court may consider whether it would reimpose the original sentence if it were directed to resentence Krueger in light of *Booker*. 401 F.3d at 483-84. If the district court answers that question in the negative, indicating that it would have imposed a lesser sentence had it known that the Guidelines were merely advisory, then plain error will have been established and we shall vacate the sentence in order to permit re-sentencing. *Id.* at 484. If, on the other hand, the district court concludes that it would reimpose the same sentence, then we shall proceed to consider whether that sentence is plainly erroneous in the sense of being unreasonable. *Id.*, citing *Booker*, 125 S. Ct. at 765.

## III.

For the reasons discussed above, we find no constitutional infirmity in Krueger's sentence based on the district court's consideration of evidence that may have been obtained in violation of the Supreme Court's decision in *Michigan v. Jackson*. However, we direct a limited remand of the sentence so that the district court may determine whether it would have sentenced Krueger differently had it known that the Sentencing Guidelines are advisory rather than mandatory. We retain appellate jurisdiction pending the outcome of the limited remand we have ordered.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*