**ALFA CORPORATION, Plaintiff,**

v.

**OAO ALFA BANK and ALFA CAPITAL MARKETS (USA), INC., Defendants.**

**No. 04 CV 8968 KMW JCF.**

United States District Court,
S.D. New York.

Feb. 21, 2007.

358

Juan C. Basombrio, Dorsey & Whitney LLP, Irvine, CA, Kevin Bryan Bedell, Dorsey & Whitney L.L.P., Washington, DC, Bruce Roy Millar Ewing, Dorsey & Whitney LLP, New York City, for Plaintiff.

Jonathan Philip Lienhard, Troutman Sanders L.L.P., McLean, VA, Peter D. Vogl, Jennifer Seraphine, Jones Day, New York City, for Defendants.

## MEMORANDUM AND ORDER

FRANCIS, United States Magistrate Judge.

The defendants in this trademark infringement case have moved to exclude the proposed testimony of the plaintiff's two expert witnesses—a linguist and an insurance executive—pursuant to Rules 702 and 703 of the Federal Rules of Evidence. For the reasons that follow, the motion is denied.

*Background*

The plaintiff, Alfa Corporation ("Alfa Corp."), is a financial services company

based in Alabama that operates throughout the United States. (Amended Complaint, ¶¶ 7, 11). The company's main business is the provision of insurance and reinsurance, but Alfa Corp. subsidiaries and related companies also provide banking services, commercial leasing, benefits, and realty and building services. (Amended Complaint, ¶¶ 10–14). The corporation holds a number of federally registered trademarks incorporating its name. (Amended Complaint, ¶¶ 17–19). The defendants Alfa Bank and Alfa Capital Markets (USA), Inc. (collectively, "Alfa Bank") are components of a Russia-based financial services group, Alfa Group, with services in Europe, Central Asia, and more recently in the United States. (Amended Complaint, ¶ 21). The company provides a range of financial services including commercial and investment banking, brokerage, and insurance. (Amended Complaint, ¶ 23).

Alfa Bank's name is a translation or transliteration of the company's Russian name, "Альфа-Банк." The plaintiff Alfa Corp. alleges that the defendants' use of the name Alfa Bank will harm its business and is likely to cause "confusion, mistake, or deception of the trade and public" as a result of the confusion of the two names and the attribution of one company's actions and services to the other. (Amended Complaint, ¶¶ 27–28). The plaintiff alleges that the defendants' conduct constitutes trademark infringement and unfair competition under federal law, 15 U.S.C. §§ 1114(1), 1125(a)(1)(A), and trademark infringement, unfair competition, and dilution under the common law. (Amended Complaint, ¶¶ 30–39).

Plaintiff Alfa Corp. seeks to introduce the testimony of two experts, Constantine Muravnik and James M. Sweitzer. Mr. Muravnik is to testify as to the transliteration of the Russian name Альфа-Банк into English, while Mr. Sweitzer's testimony concerns the operation of the insurance and reinsurance industry.

*Discussion*

A witness qualified as an expert will be permitted to testify if his or her testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." *United States v. Lumpkin,* 192 F.3d 280, 289 (2d Cir.1999) (quoting Fed. R.Evid. 702). To be admissible, expert testimony must be both relevant and reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The proponent of expert testimony must establish its admissibility by a preponderance of the evidence. *See Bourjaily v. United States,* 483 U.S. 171, 175–76, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987); *Astra Aktiebolag v. Andrx Pharmaceuticals, Inc.,* 222 F.Supp.2d 423, 487 (S.D.N.Y.2002)(citing Fed.R.Evid. 104(a)).

In *Daubert,* the United States Supreme Court confirmed that the trial court should serve as a gatekeeper, preventing the jury from being overwhelmed by unsupportable speculation cloaked as expertise. 509 U.S. at 595–96, 113 S.Ct. 2786. As the Court later elaborated, this gatekeeping role applies not only to testimony based on "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 146–49, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). In construing *Daubert,* the Second Circuit has emphasized the discretion of the trial court:

> First, … *Daubert* reinforces the idea that there should be a presumption of admissibility of evidence. Second, it emphasizes the need for flexibility in assessing whether evidence is admissible. Rather than using rigid "safeguards" for determining whether testimony should be admitted, the Court's approach is to permit the trial judge to weigh the vari-

ous considerations pertinent to the issue in question. Third, *Daubert* allows for the admissibility of scientific evidence, even if not generally accepted in the relevant scientific community, provided its reliability has independent support. Finally, the Court expressed its faith in the power of the adversary system to test "shaky but admissible" evidence, and advanced a bias in favor of admitting evidence short of that solidly and indisputably proven to be reliable.

*Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir.1995) (internal citation omitted).

In response to *Daubert* and subsequent decisions, Rule 702 of the Federal Rules of Evidence was amended and now provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.[1]

"A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible." *Amorgianos v. National Railroad Passenger Corp.*, 303 F.3d 256, 267 (2d Cir.2002). Rather, "the rejection of expert testimony is the exception rather than the rule." Fed.R.Evid. 702 advisory committee's note; *see E.E.O.C. v. Morgan Stanley & Co.*, 324 F.Supp.2d 451, 456 (S.D.N.Y. 2004); *U.S. Information Systems, Inc. v.*

*International Brotherhood of Electrical Workers Local Union No. 3, AFL–CIO*, 313 F.Supp.2d 213, 226 (S.D.N.Y.2004). This is based on the recognition that "our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." *Amorgianos*, 303 F.3d at 267. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786 (citing *Rock v. Arkansas*, 483 U.S. 44, 61, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987)).

However, "when an expert opinion is based on data, methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266; *see also Ruggiero v. Warner–Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005). Thus, " 'any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible.' " *Amorgianos*, 303 F.3d at 267 (emphasis omitted) (quoting *In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717, 745 (3d Cir.1994)). Of course, "the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Id.* at 266 (citing *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786). Nevertheless, "conclusions and methodology are not entirely distinct from one another." *General Electric Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

---

1. Even if admissible under Rule 702, expert testimony is still subject to exclusion under Rule 403 if "its probative value is substantially outweighed by the danger of unfair preju-

dice." Fed R. Evid. 403; *see also United States v. Young*, 745 F.2d 733, 765 (2d Cir. 1984) (Newman, J., concurring).

Accordingly "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*

### A. *Constantine Muravnik*

The plaintiff seeks to introduce the expert testimony of Mr. Muravnik regarding the proper transliteration of the name Альфа-Банк, (Expert Report of Constantine Muravnik ("Muravnik Rep."), attached as Exh. 1 to Declaration of Peter D. Vogl dated Nov. 17, 2006 ("Vogl Decl.")). Mr. Muravnik is a native Russian speaker who is now Senior Lector in Slavic Languages and Literatures specializing in Russian at Yale University. (Muravnik Rep., ¶¶ 2, 7). He has taught Russian since 1991 and also worked for over ten years as a Russian/English interpreter and translator. (Muravnik Rep., ¶¶ 3, 5). Mr. Muravnik holds Master's Degrees in Russian Linguistics and Literature from Moscow State University and in Slavic Languages and Literatures from Yale University; he is currently a Ph.D. candidate at Yale. (Muravnik Rep., ¶ 6).

The sum and substance of Mr. Muravnik's Report and his deposition is that the "best way to render the name ... Альфа-Банк in English" is as "Alpha Bank," rather than "Alfa Bank." (Muravnik Rep., ¶ 21; Deposition of Constantine Muravnik ("Muravnik Dep."), attached as Exh. 2 to Vogl Decl., at 98–105, 136). In formulating this opinion, Mr. Muravnik relies largely on his background and experience as "an educated native speaker of Russian." (Muravnik Dep. at 104). Mr. Muravnik's report also references *The Transliteration of Modern Russian for English–Language Publications,* by J. Thomas Shaw (the "Shaw treatise"), which he calls the most "authoritative" book on the subject, and an entry on "Transliteration of Russian Into English," from the online encyclopedia *Wikipedia.* (Muravnik Rep., ¶¶ 9–11, 14–15). Mr. Mu-

ravnik also consulted informally with a colleague in the Slavic Languages Department at Yale. (Muravnik Rep., ¶ 21). For examples of transliteration of the word Альфа, Mr. Muravnik drew heavily on online sources, including the internet version of the Russian newspaper *Pravda* (*http://english.pravda.ru* ), and the website of Human Rights House, an international non-governmental organization (*http://www.humanrightshouse.org* ). (Muravnik Rep., ¶¶ 18–19).

#### 1. *Reliability of Internet Sources*

The defendants raise two principal objections to Mr. Muravnik's testimony. First, they argue that his opinions should be excluded because they are based on "inherently unreliable" internet sources. (Defendants' Memorandum in Support of Motion to Exclude Reports and Testimony of Plaintiff's Experts ("Def.Memo.") at 3). The defendants cite both Mr. Muravnik's references to *Wikipedia* and his use of internet sites such as the online version of *Pravda.* (Def. Memo. at 3–5).

To begin with, it is not clear that internet sources in general, or the ones cited by Mr. Muravnik in particular, are inherently unreliable. Countless contemporary judicial opinions cite internet sources, and many specifically cite *Wikipedia. See, e.g., Phillips v. Pembroke Real Estate, Inc.,* 459 F.3d 128, 133 n. 3 (1st Cir.2006); *Reuland v. Hynes,* 460 F.3d 409, 422 n. 1 (2d Cir. 2006) (Winter, J. dissenting); *Allegheny Defense Project, Inc. v. United States Forest Service,* 423 F.3d 215, 218 n. 5 (3d Cir.2005); *N'Diom v. Gonzales,* 442 F.3d 494, 496 (6th Cir.2006); *United States v. Krueger,* 415 F.3d 766, 769 (7th Cir.2005); *Bourgeois v. Peters,* 387 F.3d 1303, 1312 (11th Cir.2004); *Sacirbey v. Guccione,* No. 05 Civ. 2949, 2006 WL 2585561, at *1 n. 2 (S.D.N.Y. Sept. 7, 2006); *Applied Interact, LLC v. Vermont Teddy Bear Co.,* No. 04 Civ. 8713, 2005 WL 2133416, at *11 (S.D.N.Y Sept. 6, 2005). While citing a website in a judicial opinion is not analyt-

ically identical to basing an expert opinion on such a source (which, as explained below, is not what Mr. Muravnik in fact does), the frequent citation of *Wikipedia* at least suggests that many courts do not consider it to be inherently unreliable. In fact, a recent and highly-publicized analysis in the magazine *Nature* found that the error rate of *Wikipedia* entries was not significantly greater than in those of the *Encyclopaedia Britannica*. Jim Giles, *Internet Encyclopaedias Go Head to Head* (Dec. 14, 2005), *http://www.nature.com/news/2005/051212/full/438900a.html* (finding that "the difference in accuracy was not particularly great: the average science entry in Wikipedia contained around four inaccuracies; Britannica, about three.") And, indeed, the defendants do not point to any actual errors in the entry cited by Mr. Muravnik. Thus, despite reasonable concerns about the ability of anonymous users to alter *Wikipedia* entries,[2] the information provided there is not so inherently unreliable as to render inadmissible any opinion that references it.

The cases that the defendants cite do not undermine this finding. *Campbell v. Secretary of Health and Human Services*, 69 Fed.Cl. 775 (2006), upon which the defendants primarily rely, concerns the findings of a special master who rejected the opinion of a medical expert solely on the basis of counter-evidence culled from internet sites, including *Wikipedia*. While the *Campbell* court was concerned by disclaimers on *Wikipedia* indicating that anyone may post information to the site, the remedy it imposed was to give the experts in question "an opportunity . . . to corroborate or refute the information contained in the articles." *Id.* at 781. Here, even if the expert's opinion were largely or entirely based upon *Wikipedia* and other internet sites—which it is not—the analogous solution would be to permit Mr. Muravnik to testify and to allow the parties to apply the tools of the adversary system to his report. *See Daubert*, 509 U.S. at 596, 113 S.Ct. 2786; *Amorgianos*, 303 F.3d at 267.

*English Mountain Spring Water Co. v. Chumley*, 196 S.W.3d 144 (Tenn.Ct.App. 2005), also cited by the defendants, holds merely that *Wikipedia* is not "persuasive authority," which is not the issue here. *Id.* at 149. Moreover, a significant factor in the court's decision was that *Wikipedia* was being relied upon in interpreting a statute enacted in 1937, before *Wikipedia*, or indeed the internet, existed. *Id.* at 150. Here, the matter for which *Wikipedia* is being cited concerns the current translation from modern Russian to modern English of the name of a relatively recently-founded bank.[3] Because the translation in question here is contemporaneous, there is no issue, as there was in *Chumley*, regarding the prevailing definition of words at some time in the distant past.

Finally, even if the defendants' fears about the unreliability of *Wikipedia* and other online authority were well-founded, this would not render Mr. Muravnik's expert testimony inadmissible, since his opinion is also based on other sources. In his report, Mr. Muravnik notes that because the Russian alphabet contains 36 Cyrillic characters that must be rendered using only 26 English letters, and because the Russian phonetic system is very different from the English, any regimen of transliteration is liable to be imprecise. (Murav-

---

**2.** For example, the history department at Middlebury College recently banned the citation of *Wikipedia* in papers and examinations. Professors noted, however, that like any encyclopedia, it would be a reasonable starting point for research. Noam Cohen, *A History Department Bans Citing Wikipedia As a Re-*search *Source*, N.Y. Times, Feb. 21, 2007, at B8.

**3.** According to its website, Alfa Bank was founded in 1990. *See www.alfa-bank.com/corporate*.

nik Rep., ¶ 9). Thus, he notes, there are multiple systems for transliterating Russian into English. As proof of this point, Mr. Muravnik cites to the *Wikipedia* entry on "Transliteration of Russian into English," *http://en.wikipedia.org/wiki/ Transliteration of Russian into English,* which lists five different systems of transliteration used in the United States, and to the Shaw treatise, which lists four different systems. (Muravnik Rep., ¶¶ 9–10). Mr. Muravnik then proceeds to render his opinion as to the correct transliteration of Альфа-Банк based largely on his own experience as a native Russian speaker, a Russian translator, and a professor of Russian. (Muravnik Rep., ¶ 12). To the extent that Mr. Muravnik makes subsequent reference to written sources, he relies more heavily on Shaw's treatise, the reliability of which the defendants do not question. (Muravnik Rep., ¶¶ 14, 16). Thus, even were I to strike the portion of Mr. Muravnik's testimony that is based on internet sources, that would not result in the exclusion of Mr. Muravnik's report in its entirety, nor would it cast significant doubt on his conclusion.[4]

Nor is Mr. Muravnik's opinion undermined by his use of internet sites such as the English version of *Pravda* as exemplars of various types of transliteration. (Muravnik Rep., ¶¶ 18–19). As these sources are used primarily as examples of various principles of translation and not as separate authority, their inherent reliability is somewhat beside the point. If the defendants wish to argue that these exemplars are not representative of common usage, they may cross-examine Mr. Muravnik on that topic. But the existence of counter-examples, particularly when taken out of context,[5] does not by itself undermine Mr. Muravnik's conclusions. *See Amorgianos,* 303 F.3d at 266 (citing *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786) ("[T]he district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions.").

### 2. *Application of Expertise to Facts*

The defendants' second contention is that Mr. Muravnik did not properly "appl[y][his] principles and methods reliably to the facts of the case" as required by Rule 702(3) of the Federal Rules of Evidence. (Def. Memo. at 6). In support of this argument, the defendants note that Mr. Muravnik did not review the pleadings, deposition transcripts, or other materials in this case and that he did not conduct any independent investigation into Alfa Bank. (Def. Memo. at 6). However, Mr. Muravnik is a linguistics expert and, as he testified at his deposition, the purpose of his opinion was simply "to give an academic view of what the transliteration of the Russian word Альфа should be." (Muravnik Dep. at 109).[6]

The defendants argue that comprehensive review of the case record would reveal

---

**4.** In this respect, this case is clearly distinguishable from the third decision cited by the defendants, *Loussier v. Universal Music Group, Inc.,* No. 02 Civ. 2447, 2005 U.S. Dist. LEXIS 37545 at *14–15 (S.D.N.Y. July 14, 2005), where the court excluded expert testimony based exclusively on internet postings that the court found to be hearsay not reasonably relied upon by experts.

**5.** The defendants, for instance, point to the fact that Russian words with the "ьф" letter

combination are sometimes translated using an English "f" rather than a "ph," and argue that this eviscerates Mr. Muravnik's conclusion. (Def. Memo. at 5; Vogl Decl., Exh. 5). But Mr. Muravnik states clearly in his opinion that he is interpreting the letter combination "ьф" not in isolation, but as part of the word "Альфа." (Muravnik Rep., ¶ 12).

**6.** The defendants failed to submit this portion of the deposition transcript. I have taken this quotation from the defendants' reply brief.

evidence that Alfa Bank's name is a rendering of, or perhaps a tribute to, the last name of the founder of Alfa Bank, Mikhail Alfimov, and that therefore Mr. Muravnik's opinion, which treats the word "Альфа." as the first letter of the Greek alphabet, is inapposite. (Def. Memo. at 7). Mr. Muravnik concedes that Alfa Bank's decision to spell its name in a particular manner could be based on any number of idiosyncratic reasons of which he might have no knowledge. (Muravnik Dep. at 55–56, 108).[7] Evidence that the name Alfa Bank relates to the founder's last name is certainly relevant, and the defendants may use it to counter Mr. Muravnik's opinion. But such proof does not undermine his translation of the word or render his opinion inadmissible.

In sum, Mr. Muravnik's expert opinions are founded on sufficiently reliable sources and are properly applied to the facts of the case. Accordingly, they are admissible.

### B.  *James M. Sweitzer*

█ The defendants also seek to exclude the testimony of Mr. Sweitzer, whom the plaintiff offers as an expert on the insurance and reinsurance industry. Mr. Sweitzer has worked in this industry for 36 years, for the bulk of that time as a underwriter and marketer of reinsurance for General Reinsurance Corp. (Expert Report of James M. Sweitzer ("Sweitzer Rep."), attached as Exh. 9 to Vogl Decl., ¶ 2). He has held a number of executive

positions in the industry, and his clients have included GEICO, Progressive Insurance Co., Travelers, and Hartford. (Sweitzer Rep., ¶ 2). Mr. Sweitzer seeks to testify regarding four issues that he "consider[s] important to Alfa Corp.'s continuance as a successful and growing financial services company." (Sweitzer Rep., ¶ 3). Those four issues are: (1) increasing overlap between the services provided by insurance companies and those provided by banks; (2) the importance of brand identity in the financial services industry; (3) the importance of third-party ratings in the financial services industry; and (4) the reinsurance industry. (Sweitzer Rep., ¶ 3). The defendants challenge Mr. Sweitzer's proffered testimony on several not entirely distinct bases. They argue that Mr. Sweitzer is not qualified to offer an expert opinion on the first two topics his report covers; that his opinions are not sufficiently supported; that he did not adequately apply his opinions to the facts of the case; and that his opinions on reinsurance are not relevant to the issues presented in the case. I will address each contention in turn.

#### 1.  *Qualifications*

The defendants contend that Mr. Sweitzer is not qualified to offer an opinion with regard to the convergence of the insurance and banking industries and the importance of brand identity and marketing in the insurance industry.[8] In assessing whether

(Defendants' Reply in Further Support of Defendants' Motion to Exclude Reports and Testimony of Plaintiff's Experts ("Def.Reply") at 6).

7.  I have taken these citations from the defendants' briefs. (Def. Memo. at 8; Def. Reply at 6).

8.  The defendants also protest that Mr. Sweitzer is offering expert testimony on "trademark law." (Def. Memo. at 9). It is a well-

established principle that expert testimony that merely states a legal conclusion will be excluded. *See Andrews v. Metro North Commuter Railroad Co.*, 882 F.2d 705, 709–10 (2d Cir.1989) (reversible error to allow forensic engineer to testify that "the railroad was negligent"); *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1256, 1258 (2d Cir. 1987) (upholding exclusion of testimony of expert witness that contracts were unenforceable because they lacked essential terms); *U.S. Information Systems*, 313 F.Supp.2d at

a witness is qualified to render an expert opinion, the court should first

> ascertain whether the proffered expert has the educational background or training in a relevant field. Then the court "should further compare the expert's area of expertise with the particular opinion the expert seeks to offer [and permit t]he expert ... to testify only if the expert's particular expertise ... enables the expert to give an opinion that is capable of assisting the trier of fact."

*TC Systems Inc. v. Town of Colonie*, 213 F.Supp.2d 171, 174 (E.D.N.Y.2002) (quoting *Zwillinger v. Garfield Slope Housing Corp.*, No. CV 94–4009, 1998 WL 623589, at *7 (E.D.N.Y. Aug. 17, 1998)). Moreover,

> In assessing whether a witness can testify as an expert, courts have liberally construed the expert qualification requirement. An expert should not be required to satisfy an overly narrow test of his own qualifications. In considering a witness's practical experience and educational background as criteria for qualification, the only matter the court should be concerned with is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth.

*Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, No. 04 Civ. 7369, 2006 WL 2128785, at *5 (S.D.N.Y. July 28, 2006) (internal citations and quotations omitted).

Mr. Sweitzer's extensive experience in the insurance industry qualifies him to render an opinion on the first topic: the increasing convergence between the insurance and banking industries. For instance, he can certainly attest to the fact that insurance companies began to offer banking services after regulatory barriers were removed in 1999. (Sweitzer Rep., ¶ 4). Were he to attempt to speak in detail regarding the operations of the banking industry or the banking operations of the financial services industry, he might well exceed the scope of his qualifications. His report, however, does not include such testimony.

The question of whether Mr. Sweitzer can testify as to the importance of brand identity in the insurance industry is more difficult. The defendants argue that Mr. Sweitzer's personal experience as a seller and underwriter, primarily of reinsurance, does not qualify him to testify regarding the importance of brand identity in the insurance industry or whether Alfa Bank's presence in the industry would harm Alfa Corp.'s interests. (Def. Memo. at 10–11). If Mr. Sweitzer were testifying concerning narrow or technical issues regarding trade dress or branding, this might be the case, but that is not the testimony he offers.[9] Instead, he observes only that "Alfa Corp.'s name is well-established in the insurance and financial services industries" and that "[t]he presence of another 'Alfa' of any substantial size in the insurance or financial services industry would be detrimental to the brand identity of Alfa Corp." (Sweitzer Report, ¶¶ 8, 10). The defendants will have the opportunity to address the limitations of Mr. Sweitzer's report at

---

239–40 (noting that it is inappropriate for expert to provide legal conclusions). However, the defendants do not expand upon this bare allegation, and I can find nothing in Mr. Sweitzer's report or deposition that seems to offer a conclusion regarding trademark law.

9. Contrary to the defendants' contention, there is no mention in Mr. Sweitzer's report of such technical trademark concepts as

"bridging the gap," "proximity of the parties' products," "strength of the parties' marks," or "actual confusion." (Def. Memo. at 11 n. 6). Mr. Sweitzer does use the term "zone of expansion" (Sweitzer Rep., ¶¶ 6, 12), but does not appear to be using the phrase as a term of art. At trial Mr. Sweitzer should refrain from using terms that may give the misimpression that he is offering conclusions regarding trademark law.

trial. *See McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1043 (2d Cir.1995) (stating that "quibble[s]" with an expert's experience on specific points of a case were "properly explored on cross-examination and went to his testimony's weight and credibility—not its admissibility"). Mr. Sweitzer's experience as an executive and marketer in the insurance industry is sufficient to render his testimony about the importance of brand names in that industry "capable of assisting the trier of fact." *TC Systems,* 213 F.Supp.2d at 174; *cf. Wechsler v. Hunt Health Systems, Ltd.,* 381 F.Supp.2d 135, 142–43 (S.D.N.Y.2003) (finding Certified Public Accountant with no particular experience in health care industry qualified to analyze accounts of health care company because he has extensive experience in reviewing accounts of other kinds of companies).

### 2. *Support for Opinions*

The defendants also contend that Mr. Sweitzer fails to support his opinions with a sufficient factual foundation (Def. Memo. at 12), as required by Rule 702. *See Boucher v. U.S. Suzuki Motor Corp.,* 73 F.3d 18, 22 (2d Cir.1996). They note that he did not conduct a marketing survey or other quantitative research. Instead, the basis of his opinion, apart from his considerable experience in the industry, consists of internet research, including reading the websites of the parties; consulting with several other "experienced insurance and reinsurance executives"; reviewing annual reports and other information from Alfa Corp.; reviewing the annual reports of Progressive Insurance Co. and Berkshire–Hathaway Inc. for comparison purposes; and looking up the credit and risk ratings of the plaintiff, the defendants, and the defendants' parent company, Alfa Group. (Sweitzer Report, ¶¶ 13–15; Deposition of James M. Sweitzer ("Sweitzer Dep."), attached as Exh. 10 to Vogl Decl., at 53–55, 158–59). To be sure, this is somewhat thin

support for Mr. Sweitzer's opinion. However, it is not so weak as to be "simply inadequate to support the conclusions reached." *Amorgianos,* 303 F.3d at 266.

Mr. Sweitzer is not offering testimony, such as a damages calculation, that would require a comprehensive market survey or other quantitative data. Thus, this case is distinguishable from *Trouble v. Wet Seal, Inc.,* 179 F.Supp.2d 291 (S.D.N.Y.2001), which is cited by the defendants. In that case, expert testimony on technical issues such as the likelihood of brand confusion and the resulting damages was disqualified for lack of sufficiently rigorous quantitative methodology. *Id.* at 302–03. To the extent that the defendants wish to argue that the absence of survey evidence limits the utility of Mr. Sweitzer's testimony, they may do so at trial. Again, as noted above, Mr. Sweitzer does not opine on technical trademark infringement issues, only on the importance of company identity in the insurance industry, a matter within his experience.

The defendants also argue that Mr. Sweitzer should not have relied on Alfa Corp.'s assertion that it is planning to move into the banking industry. But based on the limited factual record before me, I cannot determine that Mr. Sweitzer's reliance on that allegation is unreasonable. *See Boucher,* 73 F.3d at 21 (courts should reject expert opinions only if it is "speculative or conjectural" or relies on "assumptions that are so unreasonable and contradictory as to suggest bad faith"). If the defendants are able to refute the plaintiff's assertion at trial, it may render Mr. Sweitzer's opinion on that matter irrelevant, but it would be inappropriate to exclude his opinion on that basis at this time.

### 3. *Application to the Facts of the Case*

Next, the defendants complain that Mr. Sweitzer did not apply his opinions reliably

to the facts of the case as required by Rule 702 and *Daubert.* (Def. Memo. at 15–17). By this, the defendants seem to mean that Mr. Sweitzer did not do sufficient research into the parties or their legal claims. For instance, Mr. Sweitzer did not review the pleadings in the case, apart from the complaint, and did not interview or read the depositions of employees of either the plaintiff or the defendants. (Sweitzer Dep. at 34, 36, 44–45). It is unclear why review of the legal documents would be necessary to the preparation of Mr. Sweitzer's report, and the defendants fail to cite any authority holding that such review is required of an expert. As discussed above, the research supporting some of Mr. Sweitzer's claims is not extensive; however, it seems clear that Mr. Sweitzer applies what research he did, as well as his experience in the insurance industry, to the facts of the case.

The defendants raise a number of other specific contentions regarding Mr. Sweitzer's alleged failure to properly apply his opinion to the facts of the case. The defendants complain that he (1) could not identify specific customers of the plaintiff who might be confused by the defendant's similar name; (2) could not substantiate the plaintiff Alfa Corp.'s supposed intent to expand its offerings in the financial services arena; (3) assumes that Alfa Corp. has the "open right to converge into banking" despite the presence of other third-parties in the financial services industry with the name "Alfa" or "Alpha"; and (4) inappropriately analogizes the plaintiff to larger and better-known insurance companies such as Prudential and State Farm. (Def. Memo. at 15–16).

First, Mr. Sweitzer's inability to identify specific customers of the plaintiff who might be confused by the presence of another "Alfa" in the financial services industry is an issue that goes to the weight rather than the admissibility of his opinion.

The remaining allegations go to the merits of the case and therefore beyond what is appropriate to consider in a *Daubert* motion. For instance, while it is certainly possible that the plaintiff Alfa Corp. will fail to establish that it truly planned to expand into the banking industry (thus creating potential confusion with Alfa Bank), this issue does not affect the admissibility of Mr. Sweitzer's testimony. Similarly, the existence of third parties already using the name "Alfa" or "Alpha" certainly might affect the plaintiff's dilution and trademark infringement claims, but again, it does not render Mr. Sweitzer's testimony inadmissible.

The defendants' complaints regarding Mr. Sweitzer's use of inappropriate comparators in his report is more nearly on point, but the bare allegation by the defendants that these comparators are dissimilar, without more, does not suffice to undermine Mr. Sweitzer's analysis. Moreover, while it is almost certainly the case, as Mr. Sweitzer admitted in his deposition, that plaintiff Alfa Corp. is not as well-known as State Farm or Prudential (Sweitzer Dep. at 224), "the selection of comparators will seldom approach the 'Utopian ideal' of identifying the perfect clone" and thus such criticisms "go more to the weight afforded to [the expert's] analysis than to its admissibility." *Celebrity Cruises, Inc. v. Essef Corp.*, 434 F.Supp.2d 169, 189 (S.D.N.Y.2006) (citations omitted).

### 4. *Opinion on Reinsurance*

Finally, the defendants charge that Mr. Sweitzer's proffered testimony regarding the reinsurance industry is irrelevant because the defendants do not engage in reinsurance activities in the United States. (Def. Memo. at 17–19). However, this misses the point of his testimony, which is that potential confusion between the plain-

tiff Alfa Corp., which has an AM Best rating of A++, and the defendant Alfa Bank, which is not rated by any recognized rating agency, or its parent company Alfa Group, which has a rating of BB-, could make it more difficult for Alfa Corp. to obtain reinsurance. (Sweitzer Report, ¶¶ 13–15, 31). If the defendants disbelieve this theory, or believe that it is not adequately supported, they may certainly attack it on those grounds, but the theory plainly is not irrelevant to the plaintiff Alfa Corp.'s claim that potential confusion between Alfa Corp. and Alfa Bank will harm the plaintiff.

The defendants also assert that Mr. Sweitzer's own testimony undermines his conclusion. They note that he testified that Alfa Bank is not rated at all by the third-party rating organization AM Best. Mr. Sweitzer also described AM Best as the "best first step" for a reinsurer seeking to learn about an insurance company. (Sweitzer Dep. at 138–39). Because Alfa Bank is not rated by AM Best and AM Best is an important source of third-party ratings, the defendants argue that there can be no possibility of confusion between Alfa Bank and the plaintiff Alfa Corp. (Def. Memo. at 19). This claim also lacks merit since the fact that the defendant Alfa Bank is not rated at all by AM Best does not eliminate the risk of confusion. A reinsurer who had already confused Alfa Corp. with Alfa Bank prior to referring to AM Best might look up the rating of the company he thought he was being asked to reinsure and, seeing that Alfa Bank is unrated, refuse to offer reinsurance (since presumably the lack of a rating would not reassure the reinsurer about the viability of the company in question). Thus, while AM Best would not be the source of confusion in the first instance, the confusion of the two companies and the lack of ratings for Alfa Bank could redound to the detriment of Alfa Corp. The fact that Mr. Sweitzer also testified that as a reinsurer

he often did more research into potential clients than merely looking up their third-party rating (Sweitzer Dep. at 151), does not eliminate this risk altogether.

Thus, Mr. Sweitzer's expert testimony, while certainly not invulnerable to attack at trial, is neither irrelevant, factually unsupported, nor improperly applied to the facts of the case, and is therefore admissible.

*Conclusion*

For the reasons stated above, the defendants' motion to exclude the testimony of the plaintiff's experts Constantine Muravnik and James Sweitzer is denied.

SO ORDERED.